NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1156-14T4

PHILIP VITALE,

    Plaintiff-Respondent,

v.

SCHERING-PLOUGH CORPORATION,[1]

    Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

August 22, 2016

APPELLATE DIVISION

Argued April 27, 2016 — Decided August 22, 2016

Before Judges Fuentes, Koblitz and Gilson.

On appeal from Superior Court of New Jersey,
Law Division, Middlesex County, Docket No.
L-6175-11.

Gavin J. Rooney argued the cause for
appellant (Lowenstein Sandler LLP,
attorneys; Douglas S. Eakeley, of counsel;
Mr. Rooney and Joseph A. Fischetti, on the
briefs).

Craig M. Rothenberg argued the cause for
respondent (Rothenberg, Rubenstein, Berliner
& Shinrod, LLC, attorneys; Mr. Rothenberg,
of counsel; Mr. Rothenberg and John D.
Gagnon, on the briefs).

Jay A. Gebauer argued the cause for amicus
curiae Allied Barton Security Services, LLC
(Fowler Hirtzel McNulty & Spaulding, LLP,

---

[1] According to defendant Schering-Plough Corporation, on November 4, 2009, it merged with Merck & Co. to form the entity Merck & Co., Inc.

attorneys; Mr. Gebauer and Quinn M. McCusker, on the brief).

The opinion of the court was delivered by

KOBLITZ, J.A.D.

This appeal raises a novel question of law in New Jersey: whether a provision in an employment contract limiting a worker's right to sue a third party for negligence is enforceable. Plaintiff Philip Vitale was employed as a security guard by Allied Barton Security Services, LLC (Allied Barton), which contracted with defendant Schering-Plough Corporation to provide security services at defendant's facilities. At the commencement of his employment with Allied Barton, plaintiff signed a disclaimer waiving his right to sue any of Allied Barton's customers "to which [he] may be assigned, arising from or related to injuries which are covered under the Workers' Compensation statutes." In August 2009, plaintiff was injured while working for Allied Barton at one of defendant's work sites. Thereafter, he received workers' compensation benefits from Allied Barton and also filed this personal injury suit against defendant.

A jury subsequently found defendant's negligence caused plaintiff's injuries and awarded plaintiff $900,000 in damages, with additional amounts awarded by the court in prejudgment interest, counsel fees, and expenses under the offer of judgment

rule, R. 4:58-2. Defendant appeals from the denial of summary judgment, arguing the disclaimer was valid and enforceable. In the alternative, defendant also appeals from the final judgment, arguing a new trial is warranted because the court erred both by refusing to instruct the jury on comparative negligence, and allowing a lay witness to provide opinion testimony. We affirm the trial court's determination that the contractual limitation on plaintiff's ability to sue defendant is unenforceable as against public policy as expressed in case law and in the Workers' Compensation Act (WCA), N.J.S.A. 34:15-1 to -142, but reverse as to the court's refusal to allow the jury to consider comparative negligence.

I

Plaintiff began working as a security guard with Allied Barton in September 2005. Although he was assigned to many of defendant's work sites, he was never directly employed by defendant, which had its own in-house security employees. In 2008, plaintiff was promoted to the position of field manager, supervising Allied Barton security guards who worked at defendant's sites. One of his duties as field manager was to ensure that the guards had proper uniforms, and for that purpose he stored extra uniforms in the basement of the guardhouse at defendant's Kenilworth facility.

Allied Barton did not have exclusive use of the guardhouse basement. Defendant's security managers had keys to the basement door, and the basement was used for storage by defendant's maintenance and information technology employees. The basement also contained equipment belonging to another of defendant's contractors.

Defendant was responsible for the maintenance of both the guardhouse and the stairwell to the basement, which one entered from outside of the guardhouse. Defendant employed its own security manager, who managed the guardhouse and was responsible for inspecting the property and identifying any safety hazards. Defendant also employed maintenance staff, who were responsible for cleaning and repairing the guardhouse. The maintenance staff were required to return items to their original location after using them for the purpose of preventing safety hazards.

Plaintiff visited the guardhouse basement approximately once per month. The stairwell had a light fixture, and without that light, it was pitch black. The light switch was located at the top of the stairwell, to the left as one opened the door. Plaintiff's regular practice was to unlock the basement door, turn on the stairwell light, and proceed down the stairs. At the time of his accident, the stairwell's heavy, metal door had a handle on the left, and opened outward to the right, blocking

4

the security camera.

In the early morning of August 31, 2009, plaintiff took the basement keys from the guardhouse, told his coworker he had to go downstairs for something, and subsequently fell down the basement stairs. Plaintiff had no recollection of the accident, or of the moments immediately before and after his fall. Plaintiff's coworker, Alec Schaffer, went looking for plaintiff approximately twenty minutes after plaintiff left with the basement keys. When Schaffer opened the basement door he noticed the light was off. After he turned on the light, he saw plaintiff at the bottom of the stairs, having landed on a brown paper "cement type" bag. At the top of the stairs, near the door, Schaffer saw a ladder, crates, an industrial-type extension cord, and a fifty-pound bag of ice melt that had been knocked down a few stairs. Based upon the positioning of the bag of ice melt, Schaffer believed plaintiff had tripped over the bag, causing him to fall.

According to Schaffer, plaintiff "was in a daze" and was "out of it." The front of plaintiff's head was red, and his glasses were off and on the stairs. Plaintiff said, "he fell or tripped or something."

When emergency services arrived, plaintiff was conscious and sitting in a chair. He complained of pain in his right

ankle and left leg, and did not recall losing consciousness. Plaintiff testified that since the accident he has suffered from severe headaches and pain in his neck, shoulder, and lower back, which radiates down his leg. Notwithstanding his participation in physical therapy, he continues to have limited mobility and strength in his shoulder and arm. Plaintiff had eye surgery in 2012 that largely alleviated the headaches, but he continues to suffer cognitive difficulties, which limit his social and professional life. Plaintiff's experts opined plaintiff's symptoms were the result of permanent injuries he suffered in the fall. Defense experts opined plaintiff likely suffered only minor, non-permanent injuries from the fall, and his symptoms were consistent with his age and pre-existing medical conditions.

## II

Defendant moved for summary judgment based upon the waiver of liability plaintiff signed on September 27, 2005, when he began his employment at Allied Barton. The waiver stated:

### WORKER'S COMP DISCLAIMER

#### Payment on Work-Related Injuries

I understand that state Workers' Compensation statutes cover work-related injuries that may be sustained by me. If I am injured on the job, I understand that I am required to notify my manager immediately. The manager will inform me of

6

my state's Workers' Compensation law as it pertains to seeking medical treatment. This is to assure that reasonable medical treatment for an injury will be paid for by Allied's Workers' Compensation insurance.

As a result, and in consideration of Allied Security offering me employment, I hereby waive and forever release any and all rights I may have to:

- make a claim, or

- commence a lawsuit, or

- recover damages or losses

from or against any customer (and the employees of any customer) of Allied Security to which I may be assigned, arising from or related to injuries which are covered under the Workers' Compensation statutes.

Plaintiff, who has a high school education, had no recollection of reading or signing the disclaimer, nor did he "recall ever receiving any explanation or information indicating that [he] would waive [his] rights to file a lawsuit against anyone who caused [him] injury in exchange for employment with Allied-Barton."

Defendant and amicus Allied Barton argue the trial court erred in denying summary judgment, asserting the disclaimer plaintiff signed with Allied Barton was valid and enforceable. They cite out-of-state cases in which the same or similar disclaimers have been upheld and argue the disclaimer is consistent with New Jersey law on exculpatory clauses because it

does not preclude plaintiff from any remedy for a workplace injury, but simply limits plaintiff's remedy to workers' compensation benefits.

Plaintiff responds that the disclaimer violates public policy because it violates the letter and the spirit of the WCA. We hold the disclaimer violates public policy both because plaintiff was asked to waive his right to sue a third party, in violation of N.J.S.A. 34:15-40, and to the extent the disclaimer included a waiver of claims for reckless and intentional conduct.

### III

We review the grant of summary judgment de novo, applying the same legal standard as the trial court. State v. Perini Corp., 221 N.J. 412, 425 (2015). Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). "To the extent that the grant or denial of summary judgment is based on an issue of law, we owe no deference to an interpretation of law that flows from established facts." Perini Corp., supra, 221 N.J. at 425.

Not all employment contracts that limit the rights of employees are contracts of adhesion. See Rodriquez v. Raymours Furniture Co., 225 N.J. 343, 366-67 (2016). When an employee has little to no bargaining power and a contract is presented on "a take-it-or-leave-it" basis, the contract is one of adhesion. See ibid. Allied Barton's disclaimer constituted a contract of adhesion similar to the agreement to arbitrate contained in the employment application in Rodriquez. Plaintiff had no ability to bargain; he had the choice of either signing the disclaimer as part of his employment contract or refusing the needed job.

Although a court may enforce a contract of adhesion, such contracts are unenforceable if unconscionable. See id. at 366. Whether an employment provision is enforceable depends on an analysis of the subject of the provision, the sophistication of the employee, and whether the employee has some bargaining power. See Martindale v. Sandvik, Inc., 173 N.J. 76, 90 (2002) (upholding an agreement to arbitrate contained in an adhesion employment application where the employee was a sophisticated human resources officer). "When making the determination that a contract of adhesion is unconscionable and unenforceable, [courts] consider, using a sliding scale analysis, the way in which the contract was formed and, further, whether enforcement of the contract implicates matters of public interest."

Stelluti v. Casapenn Enters., LLC, 203 N.J. 286, 301 (2010). In other words, "[t]he unconscionability determination requires evaluation of both procedure and substance." Rodriquez, supra, 225 N.J. at 366.

Plaintiff does not allege any procedural unconscionability. He has no recollection of signing the disclaimer, and he has presented no evidence Allied Barton engaged in "fraud, deceit, or misrepresentation" in obtaining his signature on the form. See Stelluti, supra, 203 N.J. at 305. Although the parties were in an unequal bargaining position, plaintiff was entitled to reject the disclaimer and seek employment elsewhere. See id. at 302 (finding a gym's contract of adhesion valid because the plaintiff "could have taken her business to another fitness club"). Thus, whether the workers' compensation disclaimer is unenforceable depends on whether the disclaimer violates public policy.

"As a general and long-standing matter, contracting parties are afforded the liberty to bind themselves as they see fit. Out of respect for that very basic freedom, courts are hesitant to interfere with purely private agreements." Ibid. (citations omitted). Exculpatory clauses, however, are "disfavored in the law." Hojnowski v. Vans Skate Park, 187 N.J. 323, 333 (2006). They "have been subjected to close judicial scrutiny," Stelluti,

*supra*, 203 *N.J.* at 303, because they undermine the principles of our tort system by encouraging "a lack of care," *Hojnowski*, *supra*, 187 *N.J.* at 333.

Nevertheless, exculpatory agreements are enforceable if they "clearly and unambiguously reflect the 'unequivocal expression of the party giving up his or her legal rights that this decision was made voluntarily, intelligently and with the full knowledge of its legal consequences.'" *Marcinczyk v. State Police Training Comm'n*, 203 *N.J.* 586, 593 (2010) (quoting *Gershon v. Regency Diving Ctr., Inc.*, 368 *N.J. Super.* 237, 247 (App. Div. 2004)). "Even if unambiguous, it is well-established that exculpatory contracts will not be enforced where they are contrary to public policy." *Id.* at 594. "[S]ources of public policy include legislation; administrative rules, regulations or decisions; and judicial decisions." *Hitesman v. Bridgeway Inc.*, 430 *N.J. Super.* 198, 218 (App. Div. 2013) (alteration in original) (quoting *Pierce v. Ortho Pharm. Corp.*, 84 *N.J.* 58, 72 (1980)), *aff'd*, 218 *N.J.* 8 (2014).

For example, one may not contract away the statute of limitations in a case alleging a violation of the New Jersey Law Against Discrimination (LAD), *N.J.S.A.* 10:5-1 to -49. *Rodriguez*, *supra*, 225 *N.J.* at 364-65. Nor may one diminish by contract "a statutorily imposed duty," nor execute "a pre-injury

11

release from liability for intentional or reckless conduct." Stelluti, supra, 203 N.J. at 303. Exculpatory agreements for negligent conduct also "violate public policy in a variety of settings, such as in residential leases or in connection with rendering professional services." Hojnowski, supra, 187 N.J. at 333 (citations omitted).

IV

Plaintiff raises public policy concerns in the areas of premises liability and the WCA. "[P]ublic policy does not demand a per se ban against enforcement of an exculpatory agreement based on the mere existence of a duty recognized in the common law in respect of premises liability." Stelluti, supra, 203 N.J. at 306. "To properly balance the public-policy interests implicated . . . one must consider the nature of the activity and the inherent risks involved." Id. at 310.

In Stelluti, our Supreme Court concluded that exercising at a health club had inherent risks. Thus, the health club reasonably limited their liability with respect to negligence claims arising from exercise-related activities through an exculpatory agreement. Id. at 311-13. The health club, however, "could not exculpate itself from . . . reckless or gross negligence." Id. at 312. Moreover, the Court noted it was "not address[ing] the validity of the agreement's disclaimer

of liability for injuries that occur on the club's sidewalks or parking lot that are common to any commercial enterprise that has business invitees." Id. at 313.

The present case does not involve inherently risky behavior. Plaintiff was injured while attempting to walk down a flight of stairs, in the normal course of his job duties, on the premises of his employer's commercial client. This case is thus distinguishable from Stelluti, and more akin to a typical premises liability case involving a business invitee.

The applicable legal standard is:

> In New Jersey, "[b]usiness owners owe to invitees a duty of reasonable or due care to provide a safe environment for doing that which is in the scope of the invitation." That is because business owners "are in the best position to control the risk of harm. Ownership or control of the premises, for example, enables a party to prevent the harm." It follows that . . . the risk of loss should fall on the party best suited to avert injury.
>
> [Hojnowski, supra, 187 N.J. at 335 (alteration in original) (citations omitted) (first quoting Nisivoccia v. Glass Gardens, Inc., 175 N.J. 559, 563 (2003); and then quoting Kuzmicz v. Ivy Hill Park Apartments, Inc., 147 N.J. 510, 517 (1997)).]

Also, unlike Stelluti, this case does not involve an invitee waiving the right to sue for premises liability directly with the business owner. Rather, this case arises from an agreement between plaintiff and his employer, with plaintiff

having waived potential negligence claims against unidentified third parties.  As a customer of Allied Barton, defendant is clearly a third-party beneficiary of the agreement.  <u>See</u> <u>Broadway Maint. Corp. v. Rutgers, State Univ.</u>, 90 <u>N.J.</u> 253, 259-60 (1982).  Plaintiff was unaware of the nature of the risks he was undertaking when he signed the disclaimer because he did not know who Allied Barton's clients were.  He therefore could not know of the working conditions he might encounter while working at facilities of clients of Allied Barton.

The disclaimer also creates a disincentive for defendant to maintain a safe workplace for contractors working on its premises.  Defendant concedes the area in which plaintiff was injured was accessible by relatively few of its own employees.  Where the company is otherwise insulated from liability through a disclaimer such as the one at issue, the company has a reduced incentive to maintain a safe workplace for its contractors.

To the extent plaintiff waived his right to recover for reckless or intentional conduct, the disclaimer is also invalid as against public policy.  <u>Stelluti</u>, <u>supra</u>, 203 <u>N.J.</u> at 303. Defendant contends plaintiff did not waive such rights, because the disclaimer only addresses claims covered by the WCA, and claims of reckless and intentional misconduct are not covered by the WCA.  We do not construe the WCA's "intentional wrong"

exception as broadly as defendant suggests.

Under the "intentional wrong" exception, the remedy provided by the WCA is exclusive, with the exception of injuries resulting from an employer's "intentional wrong." N.J.S.A. 34:15-8. This exception "must be interpreted very narrowly" for the purpose of furthering the "underlying quid pro quo goals" of the WCA. Mabee v. Borden, Inc., 316 N.J. Super. 218, 226-28 (App. Div. 1998). To satisfy the narrow exception, our Supreme Court requires "an intentional wrong creating substantial certainty of bodily injury or death." Van Dunk v. Reckson Assocs. Realty Corp., 210 N.J. 449, 452 (2012).

Thus, conduct that would be considered reckless or intentional under general tort law may result in injuries covered by the WCA and thus unlawfully waived by the disclaimer.

V

The next question presented is whether plaintiff's waiver is congruent with the WCA. In interpreting a statute, a court's goal is to effectuate the Legislature's intent. N.J. Div. of Child Prot. & Permanency v. Y.N., 220 N.J. 165, 178 (2014). "The starting point of all statutory interpretation must be the language used in the enactment." Ibid. "An enactment that is part of a larger statutory framework should not be read in isolation, but in relation to other constituent parts so that a

15

sensible meaning may be given to the whole of the legislative scheme." Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558, 572 (2012).

"If the statutory language is clear and unambiguous, and reveals the Legislature's intent, we need look no further." Farmers Mut. Fire Ins. Co. of Salem v. N.J. Prop.-Liab. Ins. Guar. Ass'n, 215 N.J. 522, 536 (2013). "Only when faithful adherence to the words of the statute leads to more than one plausible interpretation or to an absurd result or to a result at odds with the objective of the overall legislative scheme do we look to extrinsic sources, such as legislative history." Y.N., supra, 220 N.J. at 178.

The WCA was enacted in 1911[2] "to address the variety of difficulties workers encountered in attempting to recover in tort against their employers for work-related injuries," by creating a no-fault system of compensation for workers injured in the course of their employment. Estate of Kotsovska ex rel. Kotsovska v. Liebman, 221 N.J. 568, 583 (2015).

The WCA is "social legislation designed to place the cost of work-connected injury on the employer who may readily provide for it as an operating expense." Hersh v. Cty. of Morris, 217

---

[2] Act of Nov. 4, 1911, ch. 95 (codified as amended at N.J.S.A. 34:15-1 to -142).

N.J. 236, 243 (2014) (quoting Livingstone v. Abraham & Straus, Inc., 111 N.J. 89, 94-95 (1988)). As "remedial social legislation," it "should be given liberal construction in order that its beneficent purposes may be accomplished." Kotsovska, supra, 221 N.J. at 584 (quoting Cruz v. Cent. Jersey Landscaping, Inc., 195 N.J. 33, 42 (2008)).

Our Supreme Court recently held a contract limiting the statute of limitations in a LAD case was contrary to the public policy of New Jersey, stating:

> And the anti-discrimination public policy to be fulfilled through LAD claims may not be contractually curtailed by a limitation on the time for such actions. The waiver provision at issue in this matter is therefore unenforceable as to the LAD.
>
> [Rodriquez, supra, 225 N.J. at 364-65.]

Similar to the WCA, "the LAD is remedial legislation" that should "be liberally construed 'in order to advance its beneficial purposes.'" Smith v. Millville Rescue Squad, ___ N.J. ___, ___ (2016) (slip op. at 19) (quoting Nini v. Mercer Cty. Cmty. Coll., 202 N.J. 98, 115 (2010)).

New Jersey workers' compensation law recognizes that an employee may have two employers, both of which may be liable for compensation. Hanisko v. Billy Casper Golf Mgmt., Inc., 437 N.J. Super. 349, 360 (App. Div. 2014); see also Wunschel v. City of Jersey City, 96 N.J. 651, 663 (1984) (stating the "joint

employer doctrine" may be used to establish "employment status for the purposes of workers' compensation"). In such cases, the employee is barred from maintaining a negligence action against either employer. New Amsterdam Cas. Co. v. Popovich, 18 N.J. 218, 225 (1955).

"[I]f a finding of joint employment is made, one joint employer may sue a co-employer for contribution in the event it refused to pay its pro rata share." Conway v. Mister Softee, Inc., 51 N.J. 254, 259 (1968). The co-employers' contractual relationship, however, may affect any right of indemnification, Domanoski v. Borough of Fanwood, 237 N.J. Super. 452, 459 (App. Div. 1989), or subrogation, New Amsterdam Cas. Co., supra, 18 N.J. at 228.

The Division of Workers' Compensation has "exclusive original jurisdiction of all claims for workers' compensation benefits." N.J.S.A. 34:15-49(a). Thus, our Supreme Court has recognized the forum best suited to decide the joint employment relationship is the workers' compensation court. Wunschel, supra, 96 N.J. at 664.

"New Jersey has developed its special-employee doctrine by adopting the three-prong test recommended by Professor Larson for establishing a special-employment relationship." Volb v. G.E. Capital Corp., 139 N.J. 110, 116 (1995); see also Arthur

Larson et al., Larson's Workers' Compensation Law (2016).

> When a general employer lends an employee to a special employer, the special employer becomes liable for workers' compensation only if:
>
> (a) The employee has made a contract of hire, express or implied, with the special employer;
>
> (b) The work being done is essentially that of the special employer; and
>
> (c) The special employer has the right to control the details of the work.
>
> When all three of the above conditions are satisfied in relation to both employers, both employers are liable for workmen's compensation.
>
> [Hanisko, supra, 437 N.J. Super. at 360 (quoting Blessing v. T. Shriver & Co., 94 N.J. Super. 426, 430 (App. Div. 1967)).]

As to the first factor, "[a]n employee's consent is required because the employee loses certain rights along with those he gains when he enters a new employment relationship. Most important, the worker loses the right to sue the special employer at common law for negligence." Murin v. Frapaul Constr. Co., 240 N.J. Super. 600, 608 (App. Div. 1990). Of these three factors, the most important is whether the special employer "had the right to control the special employee's work." Volb, supra, 139 N.J. at 116. Two additional factors may also be considered: (1) whether the special employer pays the

employee's wages; and (2) whether the special employer "has the power to hire, discharge or recall the employee." Hanisko, supra, 437 N.J. Super. at 361 (quoting Blessing, supra, 94 N.J. Super. at 430).

Thus the type of relationship between plaintiff, defendant, and Allied Barton has been recognized and accommodated within the WCA for decades, perhaps as far back as 1937. See Wood v. Market-Arlington Co., Inc., 15 N.J. Misc. 272, 274 (Dep't Labor 1937). In 1967, we discussed the concept of joint employers in a context similar to this case, where a company hired security guards and supplied them to work guarding other businesses' worksites. Blessing, supra, 94 N.J. Super. at 427-28.

We are not persuaded by a decision of the Supreme Court of Pennsylvania, Bowman v. Sunoco, Inc. 65 A.3d 901, 910 (Pa. 2013), or one from the District of Columbia Court of Appeals, Brown v. 1301 K St. Ltd. P'ship, 31 A.3d 902, 908 (D.C. Cir. 2011), which found Allied Security's workers' compensation disclaimer enforceable. These decisions do not reflect a consideration of our State's history concerning joint employers, nor the policy underpinning our State's workers' compensation statute. Both lead us to a different conclusion regarding the workers' compensation disclaimer.

A-1156-14T4

Defendant argues that, if the denial of summary judgment is not reversed, a new trial is nevertheless required because the court erred in not charging the jury on plaintiff's comparative negligence. We agree.

In its answer, defendant asserted a defense of comparative negligence, and it pursued that theory at trial. In his opening statement, defense counsel argued plaintiff may have fallen due to his own negligence in entering the stairwell without turning on the light. During the charge conference, however, the trial court granted plaintiff's motion for a directed verdict on that issue, finding no evidence to support a conclusion that plaintiff had been negligent. Thus, in his closing, defense counsel conceded plaintiff was not negligent, contrary to counsel's opening argument.

Thereafter, the trial court denied defendant's post-trial motion for a new trial, which was based in part upon the court's refusal to charge comparative negligence. The court stated:

> As to the issue of the inference of comparative negligence, the only . . . piece of evidence that is being suggested as the basis is the fact that the lights were off. I don't know how that would allow a jury to infer that he tried to go down the steps in the dark. You know, even if there had never been anything on the steps. . . in any of his other journeys, it just seems illogical to assume that somebody -- or even infer

that somebody would go down into a pitch black -- what was it three or four o'clock in the morning. . . , no windows, no lights, no nothing, without turning the light on.

. . . .

. . . [T]he evidence was that there was this bag that appeared to have been knocked over on the step from its position. . . . There was a ladder. There was an extension cord.

. . . .

So the single piece of evidence available to the jury as to . . . how Mr. Vitale might have fallen down would be, well, the light was off. Well, I don't know that that in any way reasonably infers that he was negligent.

. . . .

. . . [T]he only piece of evidence that we have in the record is the light switch being off at the time. There is no way a jury can . . . reasonably infer that he attempted to negotiate the steps in the pitch black. How is he going to find what he's looking for in the basement if he doesn't turn the light on? It just doesn't make any sense.

. . . [Y]ou're asking a jury to infer that somebody would go down an entire flight of stairs with a door at the end of it in the dark. Why would they infer that? Why would anybody infer that?

. . . .

. . . How would you reasonably infer someone would be unreasonable? I don't know that you should or could, but it would be pure speculation.

A-1156-14T4

Under Rule 4:40-1, a party may make a motion for a directed verdict "either at the close of all the evidence or at the close of the evidence offered by an opponent." A motion for directed verdict must be denied if, "accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom reasonable minds could differ." Potente v. Cty. of Hudson, 187 N.J. 103, 111 (2006) (quoting Monaco v. Hartz Mountain Corp., 178 N.J. 401, 413 (2004)). "[W]e apply the same standard that governs the trial courts." Frugis v. Bracigliano, 177 N.J. 250, 269 (2003).

"New Jersey law favors the apportionment of fault among responsible parties." Boryszewski v. Burke, 380 N.J. Super. 361, 374 (App. Div. 2005), certifs. denied, 186 N.J. 242 (2006). "[A]n employee's contributory negligence is generally available as a defense when the employee sues a third person in an ordinary negligence action." Kane v. Hartz Mountain Indus., Inc., 278 N.J. Super. 129, 150 (App. Div. 1994), aff'd o.b., 143 N.J. 141 (1996). Under the Comparative Negligence Act (CNA), N.J.S.A. 2A:15-5.1 to -5.8,

> In all negligence actions . . . in which the
> question of liability is in dispute, . . .
> for negligence resulting in injury to the

person . . . the trier of fact shall make the following as findings of fact:

> (1) The amount of damages which would be recoverable by the injured party regardless of any consideration of negligence or fault, that is, the full value of the injured party's damages.

> (2) The extent, in the form of a percentage, of each party's negligence or fault. The percentage of negligence or fault of each party shall be based on 100% and the total of all percentages of negligence or fault of all the parties to a suit shall be 100%.

[N.J.S.A. 2A:15-5.2(a).]

"The guiding principle of our State's comparative fault system has been the distribution of loss 'in proportion to the respective faults of the parties causing that loss.'" Brodsky v. Grinnell Haulers, Inc., 181 N.J. 102, 114 (2004) (quoting Blazovic v. Andrich, 124 N.J. 90, 107 (1991)).

To assert a defense of comparative negligence, "there must be evidence in the record from which a legitimate inference may be drawn that plaintiff's conduct was negligent and that his [or her] negligence was a proximate cause" of his injuries. La Morgese v. Kern-O-Mix, Inc., 82 N.J. Super. 581, 586 (App. Div. 1964). Although a defendant must produce some evidence, "the quantum of evidence required to qualify for an apportionment charge is low." Boryszewski, supra, 380 N.J. Super. at 384.

24

Here, plaintiff had an obligation to exercise reasonable care by using his own faculties to observe and avoid dangerous conditions. See, e.g., Berger v. Shapiro, 30 N.J. 89, 99 (1959) ("If the guest is aware of the dangerous condition or by a reasonable use of his [or her] faculties would observe it, the host is not liable."). Arguably, a slight piece of evidence supported the conclusion that plaintiff acted negligently by proceeding in the dark. When Schaffer found plaintiff at the bottom of the stairs, the stairwell light was off and the stairwell was pitch black. Schaffer was able to turn on the light without falling down the stairs. Thus, plaintiff may have voluntarily negotiated the staircase landing in the dark. From this slim evidence, the jury could infer plaintiff was negligent in not immediately turning on the stairwell light, causing him to trip over a hazard that he otherwise would have been able to avoid, resulting in his fall down the stairs.

Significant countervailing evidence indicates plaintiff tripped over an object negligently stored at the top of the stairwell before he had the opportunity to turn on the light, and the object was no longer at the top of the stairwell when Schaffer entered. Further, plaintiff's failure to immediately turn on the light would have been contrary to his normal practice. As the trial court noted, an attempt to negotiate the

basement steps in complete darkness would have been unreasonable. This factual dispute, however, should have been resolved by the jury rather than the court.

Based on the existing evidence of plaintiff's negligence, albeit slim, the trial court erred in granting plaintiff's motion for judgment on the issue of comparative negligence, and the court should have charged the jury on that defense.

We thus reverse the judgment and remand for a new trial on liability only, at which plaintiff's comparative negligence should be considered by the jury. The verdict on damages need not be retried. See Ogborne v. Mercer Cemetery Corp., 197 N.J. 448, 462 (2009) ("When the damages award is not tainted by the error in the liability portion of the case and is fairly separable, retrial need not include the issue of damages.").

VII

Defendant argues a new trial is warranted based upon the trial court's admission of Schaffer's lay opinion testimony as to the cause of plaintiff's fall. We review evidentiary rulings for an abuse of discretion, and should not reverse unless "there has been a clear error of judgment." State v. Nantambu, 221 N.J. 390, 402 (2015) (quoting State v. Harris, 209 N.J. 431, 439 (2012)). Here, Schaffer's testimony was merely a repetition of what was introduced into evidence, without objection, by way of

Schaffer's investigative report.  See R. 2:10-2 (stating an appellate court may "notice plain error not brought to the attention of the trial" court only if "it is of such a nature as to have been clearly capable of producing an unjust result"). No abuse of discretion occurred.

At trial, over defense counsel's objection, Schaffer was permitted to testify as to his belief that plaintiff tripped over the clutter at the top of the stairs.  On direct examination by plaintiff's counsel, Schaffer was questioned about the special incident report that he prepared after plaintiff's accident.  In the course of that questioning, the following testimony was elicited:

> Q.  Under "Incident Caused By" you wrote "clutter entrance."  What did you mean by that?
>
> A.  That's what I meant, cluttered, meaning those items that we were talking about before.  Obviously it caused the accident.
>
> MR. GOLD:  Objection.
>
> THE COURT:  I will overrule it if it's obvious to him, he's the eyewitness.
>
> . . . .
>
> THE COURT:  It's his observation.
>
> BY MR. ROTHENBERG:
>
> Q.  -- you can continue.
>
> A.  So, . . . that's why I put down clutter

incident, okay. I saw that bag and the -- and the stuff up there, you know. You're trying to get down the stairs and the light was out.

Q. You then wrote, "Reason for Incident," and it says "unknown." What did you mean by that?

A. . . . . I don't know why it happened. I didn't know why he went down the stairs, okay. So, it was unknown why the situation occurred. Why did he take the keys? Why did he have to go downstairs? I don't know. So, that's why I put it down.

Q. But as [to] what caused him to fall you believe it was the cluttered --

A. Yeah, the clutter --

MR. GOLD: Objection.

THE WITNESS: -- and stuff.

MR. GOLD: -- leading.

THE COURT: Well, I will -- I will overrule the objection, it has already been asked and answered. You can continue.

Thereafter, defense counsel cross-examined Schaffer regarding his opinion, and the subject was covered again on re-direct and on re-cross, with Schaffer explaining that he believed plaintiff tripped over the bag of ice melt, because the bag had been knocked over, down a few stairs.

Post-trial, defendant moved for a new trial, in part based upon the court's alleged error in admitting Schaffer's lay opinion as to the cause of plaintiff's fall. The court denied

28

the motion, finding Schaffer had testified only as to his observations and reasonable inferences from his observations.

Under N.J.R.E. 701, lay opinion is admissible if the testimony "(a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue."  "Pivotal to the admissibility of N.J.R.E. 701 evidence is perception acquired through the senses."  In re Trust Created by Agreement Dated Dec. 20, 1961, 194 N.J. 276, 283 (2008).

Schaffer's testimony that plaintiff had tripped and fallen over a bag of ice melt was rationally based on his perception of the scene.  When Schaffer discovered plaintiff at the bottom of the stairwell, he saw a bag of ice melt knocked down a few steps and observed other items stored at the top of the stairwell. His testimony was not speculative nor did his testimony negate the possibility that plaintiff stumbled and fell for some other reason, as argued by defendant.  Schaffer's impressions were significant because he was first on the scene and obligated to complete a report regarding the incident.  See, e.g., State v. LaBrutto, 114 N.J. 187, 199-202 (1989) (holding the investigating police officer could testify as a non-expert, based on his own observations, as to the point of impact of two cars in an automobile accident case).  Significantly, the

testimony did not produce an unjust result because Schaffer's testimony was a repetition of the information contained in his investigative report.

Affirmed in part, reversed in part and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION