**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0865-24

TRANSITION CONSULTING, LLC,

    Plaintiff-Respondent,

v.

FRANK PAPA and OLYMPIC
NATIONAL EXPRESS, INC.,

    Defendants-Appellants.

_____

Submitted January 14, 2026 – Decided May 11, 2026

Before Judges Currier and Jablonski.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-3304-21.

Markenstein Law, LLC, attorney for appellants (Susan M. Markenstein, of counsel and on the brief).

Maselli, Mills & Fornal, PC, attorneys for respondent (David Fornal, Shawn D. Edwards, and Melissa M. Nelson, of counsel and on the brief).

PER CURIAM

In this commercial litigation, defendants Frank Papa (Papa) and Olympic National Express, Inc. appeal from the trial court's October 7, 2024 order granting plaintiff Transition Consulting, LLC's motion for a directed verdict and dismissing defendants' counterclaims for breach of fiduciary duty and violation of the New Jersey Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -227. We affirm.

I.

This litigation spawned from a prior legal action arising from defendants' lease of trucks from Ryder Truck Rental, Inc, (Ryder) which defendants used in their business. When defendants experienced a downturn in business, they failed to make the required lease payments to Ryder and incurred early termination charges when they returned several trucks prior to the lease end date.

In September 2021, Ryder filed a complaint against defendants for nonpayment of invoices under the parties' lease agreement alleging defendants owed Ryder $451,698.61, plus accumulated interest of $13,856.64, and attorney's fees of $135,509.58, for a total demand of $601,064.83, plus accruing interest and costs.

Plaintiff's owner is in the business of providing "debt mediations to businesses." He testified at trial that he used a court news service to obtain lists

2

of civil lawsuits and then contacted small business defendants offering his company's services to negotiate with the plaintiff creditor to resolve the debt owed. In that role, plaintiff contacted defendants to offer its services to negotiate a reduction in the monies defendants owed Ryder in exchange for a fee.

Initially, plaintiff proposed a fee equal to 35% of the negotiated reduction of the Ryder debt. The parties eventually agreed to a fee equaling 20% of any reduction.

In October 2021, Papa electronically signed the Client Agreement, which stated that plaintiff would attempt to negotiate a reduction of the Ryder debt on behalf of defendants. The Client Agreement also provided that plaintiff was being retained as an "attorney-in-fact" with "all powers necessary to negotiate claims and/or debts on his (her/its) behalf." However, the Client Agreement stated plaintiff was not providing legal advice and that "[t]he services of an attorney may be sought by the client if deemed necessary." If litigation ensued between the parties, the Client Agreement provided for the prevailing party to obtain reasonable attorney's fees and costs.

During the trial, Papa testified that when he retained plaintiff, he understood that plaintiff "was going to reduce [his] debt" and that plaintiff "was

3

going to [get it] negotiated down." Papa further said that plaintiff was going to "help [his] company at the time it was in trouble."

Thereafter, plaintiff and defendants agreed upon a settlement proposal to offer Ryder, which plaintiff emailed to Ryder's counsel, stating, "[m]y client would like to see if your client would accept $157,681.00 payable with an initial payment of $7,680.00 and monthly payments thereafter of $2,798.00/month."

Ryder's counsel responded, stating:

> My client will accept the offer . . . . I have prepared the attached Stipulation in Lieu of Judgment to be filed in the action we filed with the court. Please note that the first payment is $7,681.00 not $7,680.00. Please have Mr. Papa sign for the corporation and himself. The signed Stipulation may be e-mailed back to me. Please let me know if you have any questions or concerns.

Papa agreed to the settlement terms and signed the Stipulation in Lieu of Judgment (Stipulation) on behalf of defendants. The Stipulation provided, in relevant part, that

> [i]n the event [d]efendant fails to pay in accordance with the terms set forth in this Stipulation, then, and in that event, [p]laintiff shall be entitled to obtain the entry of judgment against [d]efendant ex parte, for the current balance due in the amount of $603,143.88 plus [c]ourt costs, giving [d]efendant credit for any sums actually paid pursuant to the terms of this Stipulation.

4

A-0865-24

Following the execution of the Stipulation, plaintiff required defendants to sign an Acceptance of Settlement Offer Memorandum (Memorandum) "to accept the settlement agreement so that [Papa] could acknowledge that [plaintiff's] work was done." The Memorandum stated: "In the matter of the debt owed by Frank Papa and Olympic National Express, Inc[.] to Ryder Truck Rental, Inc. d/b/a Ryder Transportation Services. We hereby confirm our acceptance of the enclosed letter of settlement offer." Papa signed the Memorandum as an "Authorized Signatory."

In December 2021, plaintiff sent defendants an invoice for $89,092.57, representing its fee of 20% of the reduction of the Ryder debt that plaintiff negotiated on behalf of defendants. In response, Papa offered a payment plan under which he would pay plaintiff a total of $50,000 in ten monthly payments. Plaintiff rejected Papa's offer. Thereafter, Papa made three payments of $5,000 to plaintiff on December 22, 2021, January 24, 2022, and February 14, 2022.

As to the Ryder Stipulation, Papa made approximately fifteen or twenty payments before he stopped paying because the "business took a turn down" and he "just couldn't pay it anymore." Ryder later obtained a judgment against Papa for the full amount listed in its complaint.

A-0865-24

In December 2021, plaintiff filed a complaint against defendants alleging breach of contract, failure to pay and unjust enrichment. After defendants failed to answer, the court entered final judgment by default in 2022. Thereafter, defendants moved to vacate final judgment, which the court granted. Defendants then filed an answer and counterclaims alleging plaintiff violated the CFA and the fiduciary duty owed to defendants.

A jury trial took place on July 15 and 16, 2024. On July 16, the trial court granted plaintiff's motion for a directed verdict, dismissing defendants' counterclaims. The jury returned a verdict in favor of plaintiff and against defendants in the amount of $46,574.85. On October 7, 2024, the trial court entered an order for judgment in favor of plaintiff and against defendants in the amount of $116,946.79, with post-judgment interest.

## II.

On appeal, defendants contend the court erred in granting plaintiff's motion for a directed verdict and dismissing defendants' counterclaims. We disagree.

## A.

Under Rule 4:40-1, a party may make a motion for a directed verdict "either at the close of all the evidence or at the close of the evidence offered by

an opponent."  In reviewing a decision on a motion for a directed verdict, we apply the same standard that governs the trial court.  Vitale v. Schering-Plough Corp., 447 N.J. Super. 98, 120 (App. Div. 2016), aff'd as modified, 231 N.J. 234 (2017).  Under that standard, "a motion for directed verdict must be denied if, 'accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom reasonable minds could differ.'"  Id. at 120 (quoting Monaco v. Hartz Mountain Corp., 178 N.J. 401, 413 (2004)).

In granting plaintiff's motion for a directed verdict, the trial court stated:

> With respect to the claim of a breach of fiduciary duty, the agreement that was signed did create a fiduciary duty on behalf of . . . plaintiff to . . . defendant . . . So what specifically are they arguing are the duties that [plaintiff] is claimed to have violated?  One is the claim that because [plaintiff] was taking a cut of the reduction, that somehow that equates to self-dealing.
>
> I don't see it that way because frankly the bigger the reduction [plaintiff] can get, the more money he makes and the less [defendants have] to pay. . . .
>
> [Defendants] also urge upon the [c]ourt that this fiduciary duty would require [plaintiff] to encourage [defendants] to seek outside counsel before [defendants] signed this agreement.  Two things militate against that.  One, the whole reason [defendants] hired [plaintiff] in the first place was

7

[they] didn't want to pay lawyers, [Papa] didn't want to go to a lawyer. And, in fact, the agreement clearly indicated that this is not going to be legal advice.

The other problem I have is when you look at the stipulation of settlement that [Papa] signed, the thing that really got him because he ended up owing money in the event that . . . defendant fails to pay in accordance to the terms set forth in this stipulation, then in that event plaintiff shall be entitled to obtain the entry of a judgment against . . . defendant, it says, ex parte. Now, that's Latin [for] without having to re-file. I get that. That's the only thing that may be ambiguous to a layperson. For the current balance due in the amount of $603,143.88 plus costs, giving defendant credit for any sums actually paid pursuant to the terms of [the] stipulation.

And . . . there's evidence that [Papa] says he paid, what was it, for [twenty] months? So is it a violation of fiduciary duty that [plaintiff] should anticipate and counsel him, look, things may change in [twenty] months, your business may go south, there may be huge inflation, diesel prices may double, maybe you should rethink this. That's not a violation of a fiduciary duty . . . .

But [Papa] testified he knew what that paragraph meant. I just don't see any violation of a fiduciary duty and/or even if there were that there were any damages flowing from that breach of fiduciary duty. The fact that [defendants] ended up owing the money under a contract, that is not the type of damage that we're talking about.

So I'm going to grant the directed verdict as to the fiduciary duty . . . .

To establish a claim of breach of fiduciary duty, a plaintiff must prove (1) the parties had a fiduciary relationship, (2) the defendant breached a fiduciary duty owed to the plaintiff, (3) proximate cause, and (4) actual damages. See F.G. v. MacDonell, 150 N.J. 550, 563-64 (1997). "The essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position." Id. at 563. The relationship arises when one party "is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship." Ibid. Whether or not a fiduciary relationship exists is a fact sensitive inquiry. Id. at 563-64.

We are satisfied the trial court did not err in determining that although there was a fiduciary duty established by plaintiff to defendants upon execution of the Client Agreement, there was insufficient evidence presented to demonstrate that plaintiff breached that duty. Defendants agreed to the settlement terms in the Ryder offer and voluntarily entered into the Settlement with Ryder.

Moreover, defendants successfully negotiated down plaintiff's initial proposed fee of 35% of the reduction of the Ryder debt to 20% of the reduction, which was reflected in the Client Agreement. The existence of plaintiff's fee did not create any conflict of interest because plaintiff's and defendants' interests

9                                                                    A-0865-24

were aligned to obtain the largest reduction of the Ryder debt as possible. The savings of more than $400,000 that defendants received through plaintiff's efforts with Ryder far exceeded the fee owed to plaintiff under the Client Agreement.

Furthermore, defendants made between fifteen to twenty payments under the settlement agreement prior to defaulting. Any damages alleged by defendants were incurred because of their own actions in defaulting under the Stipulation and cannot be attributed to plaintiff.

B.

Defendants also contend that the trial court erred in precluding evidence of their allegations that plaintiff included false advertising on its website that violated the CFA, and in dismissing the CFA counterclaim. We are unpersuaded.

The trial court considered and dismissing defendants' counterclaim under the CFA, stating:

> I'm going to grant the directed verdict as to the fiduciary duty and less needs to be said about the [CFA] [claim] because there's nothing here. . . . [Defendants'] [c]ounsel wanted to introduce a website which counsel claims shows various misrepresentations. However, that website was never seen by [Papa] in making his decision to hire . . . plaintiff and/or the level of reliance he gave in anything that he did. There was totally no

10

reliance on it. I just don't see any consumer fraud here and I'm going to grant the directed verdict as to the consumer fraud count.

N.J.S.A. 56:8-2 provides that:

> The act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . .

A false advertising claim under the CFA requires proof of a causal nexus between the misrepresentation and the ascertainable loss. Varacallo v. Massachusetts Mut. Life Ins. Co., 332 N.J. Super. 31, 43 (App. Div. 2000). "In order to recover under the CFA, a plaintiff must show that his or her ascertainable loss was caused by the seller's unlawful practice." Heyert v. Taddese, 431 N.J. Super. 388, 421 (App. Div. 2013) (citing Roberts v. Cowgill, 316 N.J. Super. 33, 41 (App. Div. 1998)).

Papa did not testify that he reviewed plaintiff's website prior to signing the Client Agreement, nor that he made any decisions based on information he read on the website. Therefore, there was no testimony to support a causal nexus

11

between the alleged misrepresentations on the website and the proffered ascertainable loss of paying plaintiff's fee. In addition, defendants sought to introduce screenshots of the website in place in 2024. Defendants could not establish the content on these screenshots was the same as the website in place in 2021 when defendants executed the Client Agreement. The court properly barred defendants from presenting the screenshot evidence of the website.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-0865-24