NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.   A-5053-12T4

ERIC G. HANISKO,

     Plaintiff-Appellant,

v.

BILLY CASPER GOLF MANAGEMENT,
INC. and CRANBURY GOLF CLUB, LLC,

     Defendants-Respondents,

and

SKY CRANBURY, INC.,

     Defendant.

_____

> **APPROVED FOR PUBLICATION**
>
> **September 8, 2014**
>
> **APPELLATE DIVISION**

Argued May 29, 2014 — Decided September 8, 2014

Before Judges Sapp-Peterson, Lihotz and Maven.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-110-11.

Eric J. Ludwig argued the cause for appellant (Stark & Stark, attorneys; Mr. Ludwig, of counsel and on the brief).

Joseph F. Skinner argued the cause for respondents (Daly, Lamastra & Cunningham, attorneys; Mr. Skinner, of counsel and on the brief).

The opinion of the court was delivered by

SAPP-PETERSON, P.J.A.D.

Plaintiff appeals from the trial court order granting summary judgment to defendants, Billy Casper Golf Management, Inc. (BCGM) and Cranbury Golf Club, LLC (CGC), in this workplace injury case. We affirm.

BCGM is a corporation specializing in golf course management. It owns or operates more than 140 facilities in twenty-eight states. CGC is the owner of a 120-acre golf club (club) located in West Windsor. Plaintiff works as the superintendent of the club. He was hired in March 2008, after accepting a written February 27, 2008 offer of employment extended to him, on behalf of CGC and BCGM, by Colleen Suozzo, the club's general manager, to whom he reported directly. His employment package included the provision of housing at the club. On April 11, 2009, he fractured his ankle when he slipped and fell on what plaintiff alleges was a defectively-constructed wooden step in his residence.

On January 13, 2011, he filed a complaint against BCGM, CGC, and Sky Cranbury, Inc.,[1] alleging negligence. Defendants answered the complaint denying the allegations, asserting nine affirmative defenses, but did not raise the employer's immunity

_____

[1] Sky Cranbury, Inc. is an affiliate of CGC, and the entity that executed a management agreement with BCGM. It was subsequently dismissed from the case by agreement of the parties.

defense under the Workers' Compensation Act (Act), N.J.S.A. 34:15-1 to —128, specifically, N.J.S.A. 34:15-8. Two months later, plaintiff filed a workers' compensation claim petition against BCGM alleging he sustained a work-related injury as a result of his fall, which arose out of and in the course of his employment. BCGM's insurance carrier filed an answer denying compensability and asserting plaintiff's injury was not work-related.

Upon completion of discovery, defendants moved for summary judgment, arguing plaintiff's joint employment with CGC and BCGM barred the court's jurisdiction over plaintiff's personal injury complaint. During oral argument, plaintiff's counsel objected to the court's consideration of a signed version of the written offer of employment extended to plaintiff by Suozzo. The signed copy of the letter agreement was not turned over to plaintiff's counsel until two months following the close of discovery and it was unaccompanied by a certification pursuant to Rule 4:17-7.

Judge Paul Innes granted summary judgment to defendants, finding that "either under the special employers' test or the joint employer test, on either test plaintiff was . . . [an] employee of both [BCGM and CGC]." The court, although recognizing the fully executed letter agreement of employment was not provided until after the close of discovery, found that

"the fact of the matter is that the written agreement that was provided and shown [during depositions] to both Mr. Hanisko . . . and Ms. Suozzo . . . was exactly the same as the signed agreement that was provided to plaintiff when it was provided." Consequently, Judge Innes reasoned:

> Under the circumstances, M[r]. Hanisko authenticated the document -- that's the letter that was provided to Mr. Hanisko, and, in fact, Mr. Hanisko worked in accordance with the offer of employment that was submitted to him by way of the agreement. So I'm not disturbed by the fact that only the signed agreement was given at the later time. The actual unsigned agreement had been provided [to] the plaintiff, and I don't find any prejudice to plaintiff by allowing the unsigned agreement in this particular matter.

Finally, Judge Innes rejected plaintiff's argument that defendants waived the statutory defense under the Act because they did not raise this defense until summary judgment. The present appeal followed.

On appeal, plaintiff raises several points for our consideration. First, plaintiff contends defendants were judicially estopped from raising the exclusivity provisions of the Act. Second, plaintiff urges defendants waived their employer immunity defenses. Third, plaintiff asserts there was no express contract of employment between plaintiff and either CGC or BCGM. Fourth, plaintiff argues there was no implied

4

contract of employment with CGC. Finally, plaintiff contends his third-party premises liability action was properly venued in Superior Court pursuant to N.J.S.A. 34:15-40.

We have considered these points in light of the record, briefs submitted, arguments advanced, and applicable legal principles, and we reject each of the points advanced. We affirm substantially for the reasons expressed by Judge Innes in his clear and cogent oral decision of May 24, 2013.

In our de novo review of a trial court's grant or denial of summary judgment, we employ "the same standard that governs trial courts in reviewing summary judgment orders." Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J. Super. 162, 167 (App. Div.), certif. denied, 154 N.J. 608 (1998). Our task is to determine whether there are genuinely disputed issues of fact sufficient to defeat summary judgment and sufficient to submit for resolution before the trier of fact. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995); R. 4:46-2. In undertaking that task, we "view the evidence in the light most favorable to the non-moving party[,]" W.J.A. v. D.A., 210 N.J. 229, 238 (2012), without owing any special deference to the "trial court's interpretation of the law and the legal consequences that flow from established facts[.]" Manalapan

Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

We first address plaintiff's contention that defendants are judicially estopped from asserting the employer's immunity defense under the Act or, alternatively, they have waived their ability to assert this defense. We reject both contentions.

The judicial estoppel doctrine is an extraordinary remedy which should be invoked only "'when a party's inconsistent behavior will otherwise result in a miscarriage of justice.'" Kimball Intern., Inc. v. Northfield Metal Prods., 334 N.J. Super. 596, 606 (App. Div. 2000) (quoting Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 365 (3d Cir. 1996)). Under the doctrine, "[w]hen a party successfully asserts a position in a prior legal proceeding, that party cannot assert a contrary position in subsequent litigation arising out of the same events." Kress v. La Villa, 335 N.J. Super. 400, 412 (App. Div. 2000), certif. denied, 168 N.J. 289 (2001).

However, "[t]o be estopped a party must have convinced the court to accept its position in the earlier litigation." Ali v. Rutgers, 166 N.J. 280, 288 (2000). That did not occur here. It is undisputed that defendants, in their defense to plaintiff's workers' compensation petition, previously asserted that plaintiff's injuries were not work-related. At the time

defendants moved for summary judgment in the Law Division, the workers' compensation action had not been resolved. It was subsequently resolved by way of settlement, resulting in the voluntary dismissal of the claim petition without the judge of compensation resolving the jurisdictional question whether plaintiff's injuries were work-related. "Because the doctrine of judicial estoppel only applies when a court has accepted a party's position, a party ordinarily is not barred from taking an inconsistent position in successive litigation if the first action was concluded by a settlement." Kimball, supra, 334 N.J. Super. at 607.

Plaintiff's reliance upon Cummings v. Bahr, 295 N.J. Super. 374 (App. Div. 1996), is misplaced. First, Cummings involved multiple contradictory arguments raised in different hearings in the same personal injury action. Id. at 388. Here, plaintiff sought distinct relief from separate judicial fora against different permutations of defendants. Specifically, plaintiff's March 9, 2011 workers' compensation claim named only BCGM as respondent, whereas his July 13, 2011 Superior Court complaint named BCGM, CGC, Sky Cranbury, Inc., and other fictitious parties. Second, the initial argument set forth in Cummings resulted in a final decision by the court, reached in part, on the basis of the plaintiff's concession she was a licensee. Id.

at 381. In her second motion for reconsideration the plaintiff advanced "a new theory as to liability premised on a new characterization of [her] status." Id. at 384. Here, the record does not reflect, nor does plaintiff identify, any factual determination of the judge of compensation, which furthered the parties' settlement efforts and resulted in the ultimate agreement of compensation in the amount of $12,500.

Third, we discern no incompatibility between the positions advanced by defendants in the two fora, as were the circumstances in Cummings. In the Superior Court action, defendants invoked the employer's immunity doctrine, asserting that a special employee-special employer relationship existed between CGC and plaintiff. In the workers' compensation action, BCGM argued the injury did not arise in the course of employment. The position advanced by defendants in the Superior Court action implicated a jurisdictional inquiry into the existence of an employer-employee relationship. See N.J.S.A. 34:15-8. The defense advanced in the workers' compensation action assumed the existence of an employer-employee relationship, but implicated the question of the scope of employment. See Wunschel v. Jersey City, 208 N.J. Super. 234, 238 (App. Div.), certif. denied, 104 N.J. 417 (1986).

Nor does invoking the "going and coming" and "on call" rules, addressed in <u>Sabat v. Fedder Corp.</u>, 75 <u>N.J.</u> 444 (1978) and <u>Mule v. New Jersey Manufacturers Co.</u>, 356 <u>N.J. Super.</u> 389 (App. Div. 2003), which, plaintiff references, raise factual questions sufficient to have defeated summary judgment. <u>Sabat</u> and <u>Mule</u> involved commuters and accidents occurring leaving or arriving at work, triggering the analyses under the "going and coming" and "on call" rules. <u>Sabat</u>, <u>supra</u>, 75 <u>N.J.</u> at 445; <u>Mule</u>, <u>supra</u>, 356 <u>N.J. Super.</u> at 395-96. Those rules do not apply in this record, as a matter of law.

A different line of cases applies to employees residing on their employers' premises. Generally, injuries may be compensable if the "activity leading to the injury was reasonably incident to the employment." <u>Doe v. St. Michael's Med. Ctr.</u>, 184 <u>N.J. Super.</u> 1, 5 (App. Div. 1982) (citations and internal quotation marks omitted). "'Residence quarters provided for employees by the employer are . . . a part of the locus of employment and an injury sustained by an employee while using such residence facility properly, reasonably and in a manner contemplated by the employer is reasonably incidental to the employment and compensable.'" <u>Id.</u> at 6 (quoting <u>Barbarise v. Overlook Hosp. Ass'n</u>, 88 <u>N.J. Super.</u> 253, 261 (Cnty. Ct. 1965)).

In Doe, the plaintiff, a medical technologist, sustained injuries as a result of a sexual attack and robbery that transpired in her room, located in the defendant hospital's dormitory. Id. at 4. The trial court dismissed her complaint and then we affirmed in part, modifying the order to ensure transfer to the Division. Id. at 4-5, 9. We described the "bunkhouse rule," which mandates compensability for injuries obtained "when the employee is required to live on the portion of the employer's premises where the accident happens." Id. at 6.

We stated that the outcome is less clear where residency on the premises is not required, but cited with approval an earlier lower court decision in Barbarise, supra, 88 N.J. Super. at 253. There, the court confronted a similar issue of "whether a practical nurse, residing by personal choice in a residence provided by the hospital-employer[,] but not required to do so, [was] entitled to compensation for injuries sustained in a fall on a stairway in the residence at a time when she was not on duty or on call." Id. at 254. The court described the "mutual benefit doctrine," under which injuries are compensable when sustained during a recreational activity beneficial to employer and employee. Id. at 259. By analogy, the court applied this principle, to residential facilities furnished to a plaintiff.

Id. at 258. The court found the residential facilities were "mutually beneficial," allowing for immediate availability of the plaintiff's service if required and "provid[ing] the additional 'clear and substantial benefit' of rendering employment by the hospital more attractive . . . and in promoting employee morale and good will." Id. at 261.

With this precedent in mind, the circumstances of plaintiff's residency on the club's property support the entry of summary judgment as a matter of law. Like Doe and Barbarise, plaintiff was injured in a living space provided by CGC and on its property. Also, plaintiff was not required to live there, but his full-time presence on the club's property was of mutual benefit to plaintiff and CGC alike. Ibid. He paid no rent or utilities, except cable. During his deposition, plaintiff testified he was on call constantly, virtually seven days a week. Thus, his residency on the premises facilitated his continued employment while reducing his living expenses. That the lodging was meant to make the prospect of employment at the club more attractive is supported by the written offer of employment, which featured this benefit.

Given the prominence of the "manager's quarters" in plaintiff's employment package, the accident, despite occurring in the early morning hours and in the second-floor bathroom of

his residence rather than, for example, on the greens, was nevertheless within the scope of his employment and therefore compensable. Contrary to plaintiff's assertion, there was no "real issue" of fact underlying this determination such that defendants were not entitled to summary judgment as a matter of law.

Likewise, plaintiff's argument that defendants waived assertion of the workers' compensation bar because it was never pled nor raised until defendants moved for summary judgment is without merit. Subject matter jurisdiction, as the Act's exclusivity provisions implicate, is a non-waivable defense, which can be raised at any time. Marcysyn v. Hensler, 329 N.J. Super. 476, 481 (App. Div. 2000). Morris v. Krauszer's Food Stores, Inc., 300 N.J. Super. 529 (1997) is inapposite, as the issue of the workers' compensation bar to the plaintiff's recovery there was asserted by the defendant corporation, which was not legally entitled to assert the defense. Id. at 539.

Turning to plaintiff's substantive argument that a genuinely disputed issue of material fact existed as to whether he was an employee of CGC, the record supports Judge Innes's determination otherwise. "Our jurisdiction allows an employee, for the purpose of workers' compensation to have two employers, both of whom may be liable in compensation." Antheunisse v.

Tiffany & Co., Inc., 229 N.J. Super. 399, 402 (App. Div. 1988), certif. denied, 115 N.J. 59 (1989). "However, recovery against one bars the employee from maintaining a tort action against the other for the same injury." Ibid. (citing Blessing v. T. Shriver and Co., 94 N.J. Super. 426, 429-30 (App. Div. 1967)). Whether a tort action is barred is of course "dependent upon a determination that the borrower of an employee is, in fact, a special employer." Blessing, supra, 94 N.J. Super. at 430.

In Blessing, we adopted Professor Larson's three-part test for assessing whether a special employee relationship has formed:

> When a general employer lends an employee to a special employer, the special employer becomes liable for workers' compensation only if:
>
> (a) The employee has made a contract of hire, express or implied, with the special employer;
>
> (b) The work being done is essentially that of the special employer; and
>
> (c) The special employer has the right to control the details of the work.
>
> When all three of the above conditions are satisfied in relation to both employers, both employers are liable for workmen's compensation.
>
> [Id. at 430 (quoting 1A Larson Workmen's Compensation (1966), § 48.00 p. 710).]

A-5053-12T4

We also acknowledged input from federal authorities holding the "'ultimate test is: Whose is the work being done?'" Id. at 431 (quoting Jones v. George F. Getty Oil Co., 92 F.2d 255, 263 (10 Cir. 1937), cert. denied sub nom., Associated Indemnity Corp v. George F. Getty Oil Co., 303 U.S. 644, 58 S. Ct. 644, 82 L. Ed. 1106 (1938)). We added two other co-equal factors for consideration, recognized by other authorities, "namely, whether the special employer (1) pays the lent employee's wages, and (2) has the power to hire, discharge or recall the employee." Id. at 430 (citing 3 Schneider, Workmen's Compensation (3d ed. 1943), § 782(c), pp. 19-21; 99 C.J.S. Workmen's Compensation § 47(c)(3, 4), pp. 249-250; Thomas v. Hycon, Inc., 244 F. Supp 151, 155-56 (D.D.C. 1965); Restatement Agency 2d, § 227 (1958)).

Subsequently in Volb v. G.E. Capital Corp., 139 N.J. 110 (1995), the Court expressed its approval of our adoption of the Larson test, as well as two additional factors, particularly noting that "the most important factor in determining a special employee's status is whether the borrowing employer had the right to control the special employee's work[.]" Id. at 116.

In Kelly v. Geriatric and Medical Services, Inc., 287 N.J. Super. 567 (App. Div.), aff'd, 147 N.J. 42 (1996), we considered all five factors in upholding the trial court's dismissal of the plaintiff's complaint on the basis that in addition to being an

employee of a temporary nursing services provider, she was also a special employee of the convalescent center where she had been assigned and where she sustained a work-related injury. Id. at 578. We stated, however, the five-factor test does not provide the exclusive legal criteria by which to "establish a special employer-special employee relationship[.]" Id. at 571.

Plaintiff argues "no express contract of employment existed between plaintiff and either [CGC] or [BCGM]." Specifically, he argues the offer letter was not a "written contract of employment." And, further, the signed version in the record was not properly authenticated. In response, defendants urge the letter reflects the material terms of his employment agreement verified by subsequent performance.

"In reviewing a trial court's evidential ruling, an appellate court is limited to examining the decision for abuse of discretion." Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008); see also Konop v. Rosen, 425 N.J. Super. 391, 401 (App. Div. 2012) ("The latitude initially afforded to the trial court in making a decision of the admissibility of evidence -- one that is entrusted to the exercise of sound discretion -- requires that appellate review, in equal measures, generally sustain that decision, provided it is supported by credible evidence in the record." (quoting Estate of Hanges v. Metro Prop. & Cas. Ins.

Co., 202 N.J. 369, 384 (2010))).  Under this standard, "an appellate court should not substitute its own judgment for that of the trial court, unless the trial court's ruling was so wide of the mark that a manifest denial of justice resulted."  State v. Brown, 170 N.J. 138, 147 (2001) (citations and internal quotation marks omitted).

Here, there is adequate evidence to support the trial court's finding that "a written contract [existed] between the parties."  At his deposition, plaintiff acknowledged there was a signed agreement.  When shown the offer letter, plaintiff stated he signed "something similar."  The offer letter reflects the material terms of an employment agreement, including compensation of $1,730.11 bi-weekly and the provision of housing on the premises in exchange for plaintiff's services as superintendent.  During his deposition, plaintiff acknowledged these were the terms of his employment and he does not dispute the same on appeal.  The offer letter invited plaintiff "to indicate [his] understanding and acceptance of this offer by signing and returning one copy of this letter no later than Wednesday, March 5, 2008[.]"  Although the offer letter bore the BCGM logo, Suozzo, in her capacity as general manager of CGC, specifically made the offer "[o]n behalf of CGC" and expressed

excitement about the proposition of "[p]laintiff joining [the] team at [BCGM] and [CGC]."

It is undisputed that, in accordance with the terms of the offer letter, CGC paid plaintiff's salary. BCGM provided plaintiff's benefits. Thus, although the signed version of the offer letter in the record was not authenticated by plaintiff or Suozzo at the time of their respective depositions, the parties do not dispute the authenticity of the executed letter subsequently provided after the close of discovery and considered by the court during the summary judgment argument.[2] Given (1) the absence of any dispute over the signed letter's authenticity, and (2) the fact that the letter was originally given to plaintiff by defendants long ago at the time he began his employment, we find no impropriety in the trial court considering the letter, even though a fully executed copy of it was not located until after the discovery period ended. There was no need for defendants in these particular circumstances to amend their answers to interrogatories pursuant to Rule 4:17-7

---

[2] Plaintiff's counsel, during oral argument before the motion judge, initially disputed that the signed letter and unsigned letter were exactly the same. When asked to present his argument to support this contention, counsel instead argued defendants had waived the dual employer argument, and identified to the court no discrepancies between the signed and unsigned versions of the letter.

in order for the motion judge to consider the letter as part of his analysis of the substantive issues.

Addressing the elements of the special relationship, contrary to plaintiff's assertion that CGC did not "control[] the details of [plaintiff's] work," the record establishes CGC exercised significant control and supervision over plaintiff. Pursuant to the offer letter, plaintiff was to "report directly to [Suozzo] on a day-to-day basis." At her deposition, Suozzo described her role as "general manager for the entire property," and noted that among her other duties, she had "hands-on responsibility with regard to the day-to-day operation and maintenance of the golf course." Elaborating on the extent of her control over the details of plaintiff's work, Suozzo testified she routinely met with the superintendents, checked the course conditions, walked the property, managed the pace of play on the course, and ensured "[her] staff [was] doing what [her] staff [was] supposed to be doing." These facts support Judge Innes's finding that "Suozzo . . . provided direction to plaintiff and that [she] had the right to control plaintiff on how to perform the assigned tasks."

That the scope of Suozzo's authority at the course was pervasive and extended beyond management of the clubhouse is further evidenced by plaintiff's deposition. In plaintiff's

testimony, he noted Suozzo's status as "general manager." Significantly, he explained that if the "manager's quarters" required any repair or maintenance, he contacted Suozzo, who arranged for such issues to be resolved. Thus, plaintiff's attempt to relegate Suozzo's role to that of "the bar and restaurant manager" is simply unsupported by the record.

Plaintiff asserts Suozzo did not direct his work because preparation and maintenance of the course was within his expertise and not Suozzo's. However, "the actual exercise of control is not as determinative as the right of control itself, because, in many instances, the expertise of an employee precludes an employer from giving him [or her] any effective direction concerning the method he [or she] selects in carrying out his [or her] duties." Kelly, supra, 287 N.J. Super. at 575-76 (citations and internal quotation marks omitted).

Plaintiff urges the record establishes that Matt Fauerbach, BCGM's regional manager, who was not employed by CGC, was the person who actually supervised him. He contends further that it was Fauerbach who had the expertise in agronomy which was comparable to or surpassed his own knowledge. However, Fauerbach, in his capacity as "regional manager," only met with plaintiff on a monthly basis. It was Suozzo, a CGC employee, who supervised plaintiff and the course's operations, including

maintenance of the golf course, on a daily basis. Consequently, the trial court properly found that CGC "ha[d] the right to control the details of [plaintiff's] work[.]" Id. at 572.

Significantly, plaintiff's work maintaining the golf course was integral to the successful operation of CGC as a country club. Indeed, the proper execution of plaintiff's responsibilities as superintendent were so essential he resided on the premises to ensure he was readily available to address course maintenance issues as they arose. Such on-site residency and demanding work hours further support a finding CGC exercised significant control and supervision over plaintiff. These circumstances support Judge Innes's findings under the second prong that "the work being done by the employee [was] essentially that of the special employer[.]" Id. at 571.

Plaintiff's argument that there is no evidence in the record CGC "ha[d] the power to hire, discharge, or recall [plaintiff,]" is without merit. Suozzo, acting in her capacity as general manager of CGC, specifically extended to plaintiff an offer to join the "team at [BCGM] and [CGC]." The letter further expressed that CGC "may terminate the working relationship at any time, with or without cause."

Because we conclude plaintiff was a special employee of CGC, we need not address plaintiff's argument the trial court

A-5053-12T4

erred in finding a joint venture relationship existed between BCGM and CGC. Such a relationship is not a condition precedent to establishing a special employee relationship where other factors, such as those we conclude Judge Innes properly determined existed here, have been satisfied.

Finally, plaintiff's argument that the trial court improperly transferred the matter to the Division of Workers' Compensation is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION