**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2302-21

JUANA POLANCO URENA,

      Petitioner-Respondent,

v.

A&D FREIGHT LOGISTICS, LLC,

      Respondent-Respondent/
Cross-Appellant,

and

TRIPLE STAR TRANSPORT,

      Respondent-Respondent,

and

RIO SERVICES, INC.,

      Respondent,

and

A&D CONTAINER LOGISTICS, LLC,

      Respondent-Respondent.

_____

HARTFORD UNDERWRITERS
INSURANCE COMPANY,

    Respondent-Appellant/
    Cross-Respondent,

and

NEW JERSEY CASUALTY
INSURANCE COMPANY,

    Respondent.

_____

Argued October 30, 2023 – Decided July 29, 2024

Before Judges Mawla, Marczyk, and Chase.

On appeal from the Division of Workers' Compensation, New Jersey Department of Labor and Workforce Development, Claim Petition Nos. 2017-10893, 2017-11163, 2017-11217, and 2017-22658.

David J. Dering argued the cause for appellant/cross-respondent Hartford Underwriters Insurance Company (Leary, Bride, Mergner & Bongiovanni, attorneys; David J. Dering, of counsel and on the briefs).

Keith E. Nagy argued the cause for respondent/cross-appellant A&D Freight Logistics, LLC (Capehart & Scatchard, PA, attorneys; Keith E. Nagy, on the briefs).

William T. Freeman argued the cause for respondent A&D Container Logistics, LLC (Brown & Connery, LLP, attorneys; William T. Freeman, on the brief).

2

Richard J. Williams, Jr., argued the cause for respondent New Jersey Casualty Insurance Company (McElroy, Deutsch, Mulvaney & Carpenter, LLP, attorneys; Richard J. Williams, Jr., of counsel and on the brief).

Ricky Edward Bagolie argued the cause for respondent Juana Polanco Urena (Bagolie Friedman, attorneys; Ricky Edward Bagolie, on the brief).

PER CURIAM

Hartford Underwriters Insurance ("Hartford") appeals from a February 15, 2022 order by the Department of Labor and Workforce Development, Division of Workers' Compensation, denying its motion to dismiss petitioner Juana Polanco Urena's claim for lack of coverage. The workers' compensation court held Hartford did not comply with statutory requirements to effectively cancel its policy. A&D Freight Logistics, LLC ("Freight") cross-appeals from the court's January 19, 2022 and February 15, 2022 orders finding that it was liable for dependency benefits as decedent's employer. We affirm.

I.

A.

This case involves a coverage dispute involving multiple carriers: Hartford, New Jersey Property Liability Insurance Guarantee Association ("NJPLIGA"), New Jersey Casualty Insurance Company ("NJCIC"), and New

Jersey Manufacturers Insurance ("NJM"). The dispute arises out of a fatal accident involving decedent Carlos Urena Valverde, which occurred on March 31, 2017.

Decedent was the owner-operator of Triple Star Transport, LLC ("Triple Star"). He was assigned to transport materials through the companies A&D Container Logistics, LLC ("Container") and Freight. Container was insured by NJCIC. Freight was insured by NJPLIGA.[1] Triple Star was insured by Hartford.

Petitioner, decedent's wife, filed separate claim petitions for dependency benefits against Triple Star, Container, and Freight, later amending them to include their insurers (Hartford, NJM, and NJPLIGA, respectively). Hartford filed an answer claiming the policy issued to Triple Star was cancelled prior to the date of the fatal accident. NJM, NJCIC, and Container filed separate answers claiming Freight, not Container, was the employer of decedent. Freight filed an answer denying it employed decedent. Hartford moved to dismiss for lack of coverage.

The court consolidated the various claim petitions and proceeded with testimony to address the issues regarding compensability, employment, and

---

[1] Freight was previously insured by Guarantee Insurance Company ("Guarantee"), which is now insolvent. NJPLIGA replaced Guarantee as the insurer for Freight.

A-2302-21

Hartford's motion regarding coverage. On January 29, 2020, following the testimony of petitioner, defendants conceded the issue of dependency.[2]

After Hartford presented witnesses on the issue of cancellation, the court found Hartford "failed to establish that it properly effectuated cancellation of its policy with Triple Star" on February 17, 2021.[3] The court also found decedent worked for Freight and further determined Hartford, Freight, and Container were responsible to pay dependency benefits. It concluded, under dual employment principles, that all three carriers were equally liable to provide dependency benefits to petitioner.

Hartford moved for reconsideration on the cancellation issue and was permitted to reopen discovery to present additional witness testimony. The court thereafter withdrew its original decision concerning the cancellation of Hartford's policy. The court subsequently took testimony from additional

---

[2]  The court also issued an interim order that Hartford shall pay petitioner benefits without prejudice, subject to an order of reimbursement, should the court later determine another party liable for such benefits.

[3]  The court initially determined Hartford failed to sustain its burden that it properly cancelled the policy issued to Triple Star because Hartford failed to present testimony from a corporate representative with factual knowledge regarding the circumstances surrounding the cancellation of the Hartford policy. Accordingly, Hartford could not establish that it complied with N.J.S.A. 34:15-81.

witnesses Hartford presented in March 2021.  On January 19, 2022, the court rendered a supplemental decision and opinion concluding Hartford had not properly cancelled the policy issued to Triple Star.  Pursuant to the decisions rendered on February 17, 2021, and January 19, 2022, the court entered an order denying Hartford's motion to dismiss for lack of coverage and determined that Triple Star through Hartford, Freight through NJPLIGA, and Container through NJM were to pay dependency benefits in equal shares.

B.

By way of background, Triple Star obtained insurance with Hartford through the New Jersey Workers' Compensation Insurance Plan ("the Plan"). The Plan is a program established by the New Jersey Compensation Rating and Inspection Bureau ("the Bureau") to ensure that all employers in New Jersey have a source from which they can obtain statutorily mandated workers' compensation insurance.  When three insurance carriers have declined to write coverage for an employer, that employer is then permitted to apply to the Bureau, who will then assign an insurer to issue the policy to the employer under the Plan.

In May 2016, Triple Star applied to the Bureau for coverage under the Plan with the assistance of the licensed insurance broker, Chadler Solutions

("Chadler"). Michael Iannoconi, the CEO of Chadler, testified regarding the application for insurance made on behalf of Triple Star. Iannoconi identified Triple Star's application for insurance through the Plan. He explained that applications to the Plan contain the following language:

> I AGREE TO MAKE AVAILABLE ALL RECORDS NECESSARY FOR A CARRIER OR RATING BUREAU AUDIT AND TO PERMIT THE AUDITOR OR OTHER REPRESENTATIVE TO MAKE A PHYSICAL INSPECTION OF OUR PREMISES/OPERATIONS. I UNDERSTAND THAT FAILURE TO DO THIS MAY RESULT IN TERMINATION OF THE COVERAGE PROVIDED, CIVIL PENALTIES AND/OR CRIMINAL PROSECUTION.

The application further requires the producer to explain the procedures to the applicant. It notes:

> I HEREBY CERTIFY THAT I HAVE READ AND UNDERSTAND THE INSTRUCTIONS RELATED TO THIS FORM AND HAVE FULLY EXPLAINED THE RULES AND PROCEDURES OF [THE PLAN] TO THE INSURED.

The policy also contained a "Workers' Compensation Insurance Eligibility Endorsement." This document stated the insured agreed to allow the insurance provider to "examine and audit [the insured's] records and otherwise fully cooperate with [the insurer's] attempts to conduct premium audits or inspect the workplaces." It continues in bold type to advise the insured: "Your compliance

7

with each eligibility condition is material to the continuation of coverage through the . . . Plan. [The insurer] may, to the extent allowed by the . . . Bureau, initiate a mid-term cancellation, if you fail to comply with any of these policy conditions."

Iannoconi explained Chadler generally followed certain procedures to ensure applicants like Triple Star acknowledged the above language quoted from the application. He also stated that it was the practice of his brokerage employees to discuss with the clients that they need to be prepared for an audit.

After Triple Star's application to the Plan was submitted, the Bureau assigned Hartford to write a policy for Triple Star, and Hartford issued a policy to cover Triple Star from May 5, 2016 to May 5, 2017. Hartford contracted with Travelers Indemnity Company ("Travelers") to administer their policies under the Plan, and an underwriting employee of Travelers, Joanne Sadler, was assigned to underwrite the Hartford policy.

Sadler testified that, upon receipt of the assignment of the policy issued to Triple Star, she determined the policy required a preliminary audit based on "[p]articular codes and premium thresholds." Sadler explained she did not have a personal recollection of the steps taken to audit the policy. Based on her review of the records, auditors at Travelers called Triple Star multiple times to

schedule the audit. On July 16, 2016, Hartford sent a "Notice of Noncooperation with Physical Audit" to Triple Star via certified mail. Sadler confirmed the notice sent to Triple Star was returned by the U.S. Postal Service with a notation: "unclaimed unable to forward." Sadler then sent a letter to the Bureau informing them of Triple Star's noncooperation and requesting they "intercede and instruct" Triple Star that cooperation is necessary under the Plan.

On October 25, 2016, the Bureau in turn sent a letter to Triple Star stating its "failure to cooperate will jeopardize [its] continued right to coverage." This letter notified Triple Star that it had twenty days "to make arrangements to complete the required audit." It noted that "[f]ailure to contact the carrier within this time frame [would] result in [the Bureau's] authorization to cancel [Triple Star's] coverage." On the same day, the Bureau sent a letter to Hartford advising the Bureau had notified Triple Star and stating: "Please notify our office if the requirements are met. If you do not hear from the employer within the time frame stipulated in the attached letter, you may proceed to issue a notice to initiate cancellation of coverage for non-compliance with [the Plan] rules." Sadler could not recall if Triple Star responded to the requests, and she did not recall if she was the only underwriter assigned to Triple Star's file. She also did not know if the policy issued to Triple Star was paid in full. On November 30,

2016, Hartford sent the notice of cancellation to Triple Star with an effective cancellation date of January 20, 2017.

Marcia Coke, the output manager of Travelers' mailing/data center located in Georgia, explained her department handled the mailing of cancellation notices to employers like Triple Star in New Jersey. She noted the data center was responsible for mailing two to three million items per month. Coke did not personally mail the notices related to Triple Star, but she performed a supervisory role in the mail center. The employee who signed the certification for the "direct notice of cancellation list" mailing purportedly sent to Triple Star was Nicole Halliday (who did not testify). Coke testified the certification page on the cancellation notice sent to Triple Star indicated it was mailed on November 30, 2016. She explained a U.S. Postal Service employee would come to her facility and sign and stamp the form prepared by Travelers as a certification that the post office received the mailings.

Gregory Johnson, a senior compliance consultant with Travelers, explained members of his compliance team were responsible for the standard certification process of the cancellations sent to the Bureau. He wrote and electronically signed an email to the Bureau informing them Hartford had

A-2302-21

cancelled Triple Star's policy.[4]  Johnson signed a certification, which stated, "the undersigned on behalf of the carrier further certifies that notice to terminate the stated contracts of insurance have been given to employers in accordance with the requirements."  Johnson explained Hartford regularly emails its cancellation list to the Bureau and includes the policy details, the date the cancellation was mailed to the employer, and the date of the intended cancellation.  He had no specific knowledge if the notice of cancellation was mailed to Triple Star.  Importantly, he added he was not involved in the decision to cancel Triple Star's policy.

C.

Petitioner testified she believed decedent was an employee of Freight prior to his accident.  She explained decedent received paychecks from Freight and Container.  Decedent owned Triple Star, which consisted of a truck and a trailer.  When presented with a photograph of the vehicle depicting the "A&D Freight Logistics, LLC" decal on the side of decedent's truck, petitioner stated: "That's the company my husband worked for."  Additionally, decedent was using and displaying Freight's Department of Transportation ("DOT") number to

---

[4]  Triple Star was one of several entities listed on an Excel spreadsheet sent to the Bureau.

legally transport loads across state lines for Freight. She also testified decedent did not deliver freight for any companies other than Freight or Container. Decedent was also required to undergo drug testing pursuant to Freight's drug testing policy.

Triple Star and Freight entered into a lease agreement in April 2016. The lease provided that Triple Star would transport goods for Freight for a period of one year subject to automatic renewal "unless terminated earlier by either party." The lease noted that Triple Star was solely responsible for the operation of the equipment and transportation of freight on behalf of Freight. It required Triple Star to "remain licensed and authorized by the [DOT] to provide interstate transportation services," as well as notify Freight if its "[o]perating [a]uthority [was] revoked, suspended[,] or rendered inactive." The lease also stated Triple Star may not "re-lease, assign[,] or subcontract . . . without written consent." It further stated the relationship between the parties "shall, at all times, be that of an independent contractor, and nothing in this Agreement shall be construed to create an employee employer relationship."

The Occupational Safety and Health Administration Investigation Report pertaining to decedent's accident stated decedent kept a driver's "daily log" for Freight in the truck. Driver settlement statements from Freight showed Freight

12

deducted $140 per week from decedent's pay for workers' compensation coverage. Freight issued a 1099-MISC documenting $127,545.24 in income paid to Triple Star in 2016. Photographs of the truck decedent was operating on the day of the accident showed a clearly visible decal that read "A&D Freight Logistics, LLC."

Michael Mastrangelo, an owner of Freight, explained that Freight (a freight-hauling business) and A&D Logistics (a garbage-hauling business) were originally insured together under a single workers' compensation policy issued by Guarantee, but the owners of the companies believed Guarantee was going to "[get] rid of" the insurance policy for Freight. Mastrangelo stated Freight attempted to purchase its own workers' compensation policy, but it was denied by several insurance companies due to the common ownership between Freight and Logistics. In December 2016, Mastrangelo and his partners formed Container, a new entity, for the "sole purpose" of obtaining workers' compensation coverage for the owner/operators that worked for both companies because it was determined that certain of the owner/operators were not maintaining workers' compensation coverage despite their contracts with Freight requiring them to maintain same. Iannoconi testified Container created

13

an umbrella policy for owner/operators, which became effective in December 2016, and was in effect on March 31, 2017.

## D.

Regarding Freight's argument it was not a special employer of decedent, the court concluded decedent was operating a truck, which he owned and for which he maintained workers' compensation coverage with Hartford at the time of the March 31, 2017 accident. The court noted "decedent worked or hauled for [Freight,] which also maintained workers' compensation insurance and for which deductions were being made directly from the decedent's wages for the express purpose of paying workers' compensation insurance under the [Container] policy underwritten by [NJM]." The court also noted the policy was in effect on March 31, 2017.

The court stated decedent was driving his truck for Freight under "its lease agreement with Triple Star," and the truck was insured not only through the Hartford policy with Triple Star but also through the Container policy. Accordingly, decedent was an employee of Freight at the time of his death. Relying on Vitale v. Schering-Plough Corp., 447 N.J. Super. 98, 116 (App. Div. 2016), the court noted that New Jersey workers' compensation law "recognizes that an employee may have two employers, both of which may be liable for

14

compensation." The court further relied on the three-prong test for establishing a special employment relationship under Volb v. G.E. Capital Corp., 139 N.J. 110, 116 (1995).

The court determined, "by virtue of the lease agreement between Triple Star . . . and [Freight] and the fact that [Freight] deducted $140 per week . . . from the decedent's pay for workers' compensation coverage," decedent was an employee of Freight. Further, because decedent was hauling for Freight to a Freight customer located in Maryland on the day of the accident, the work was "essentially that of the special employer and in a truck bearing [Freight's] decal and . . . [DOT] number." It ruled that Freight "controlled the details of the work being performed by the decedent, including the amount to be paid for the haul, the materials being hauled or transported, the customer being delivered to, and the time and place where the freight had to be delivered." Additionally, the court noted that Freight "paid all of the wages earned by the decedent based upon the unrebutted testimony of . . . [p]etitioner and a review of [his] tax returns." Moreover, Freight "had the power to discharge [decedent] in this matter, notwithstanding the right of either party by the terms of the lease agreement, to terminate the lease upon written notice." Furthermore, decedent worked

exclusively for Freight, and he died in a work-related accident while employed by Freight.

The court next addressed Hartford's arguments that it properly cancelled Triple Star's policy. The court considered the testimony of three additional witnesses from Hartford. Relying on N.J.S.A. 34:15-81 and the New Jersey Employer's Liability Insurance Manual, Part 3, § 13, it held that Hartford "failed to sustain its burden to establish that it properly cancelled the policy with . . . Triple Star." The court noted Hartford failed to comply with the "strict prescriptions" set forth in N.J.S.A. 34:15-81 and the New Jersey Employer's Liability Insurance Manual. It determined, "the . . . testimony presented by the three corporate representatives of . . . Hartford lacked sufficient factual knowledge regarding the submitted documents in support of the cancellation." Despite Sadler's knowledge regarding the underwriting of the policy, the court noted it was unable "to present sufficient factual evidence" regarding the cancellation of Hartford's policy with Triple Star.

The court further noted that Sadler did not make any of the calls directly to Triple Star, and she did not know "whether there was ever a response by the insured arranging for the audit." It determined Sadler was not aware of whether she was the only underwriter or if the policy was paid off. Although Hartford

presented Coke's testimony, she could not certify the documents "were in fact presented to the [U.S. Postal Service] because A. Davis," was the only person competent to testify the documents were presented to the post office. Accordingly, the court determined Hartford could not satisfy its burden under N.J.S.A. 34:15-81(a).

The court further determined Hartford failed to establish under N.J.S.A. 34:15-81(b) that it provided the Bureau with a "certified statement" that the notice of cancellation was given to the employer by registered mail. It noted Johnson "did not have personal knowledge that the notice of cancellation was sent to Triple [Star] . . . and the only person competent to testify . . . as required by . . . N.J.S.A. 34:15-81, that the notice provisions were complied with was Nicole Halliday, a witness not presented." The court concluded that Hartford failed to establish it effectuated a valid cancellation of its policy with Triple Star.

## II.

On appeal, Hartford argues as follows:

> POINT I: THE ORDER BELOW SHOULD BE REVERSED AS THE EVIDENCE ESTABLISHED THE REQUIRED ELEMENTS OF CANCELLATION BY A PREPONDERANCE OF THE EVIDENCE.

> POINT II: HARTFORD COMPLIED WITH ALL REQUIREMENTS FOR CANCELLATION OF THE POLICY AT ISSUE UNDER THE STATUTES AND

A-2302-21

ADMINISTRATIVE REGULATIONS WHICH ARE ACTUALLY APPLICABLE TO THIS CANCELLATION.

POINT III: THE COURT BELOW WAS CORRECT IN DETERMINING THAT [FREIGHT] WAS AN "EMPLOYER" OF THE DECEDENT FOR PURPOSES OF LIABILITY FOR WORKERS' COMPENSATION BENEFITS.

On the cross-appeal, Freight argues as follows:

POINT II-A: THE TRIAL COURT ERRED IN FINDING [FREIGHT] LIABLE AS A SPECIAL EMPLOYER AS TRIPLE STAR WAS AN INDEPENDENT CONTRACTOR WITH AN ACTIVE POLICY ISSUED BY . . . HARTFORD.

POINT II-B: THE TRIAL COURT ERRED IN FINDING THAT THE POLICY ISSUED TO [FREIGHT] IS LIABLE FOR BENEFITS AS THE INTENTION OF THE PARTIES WAS FOR THE POLICY ISSUED TO [CONTAINER] TO BE LIABLE FOR BENEFITS IN THE EVENT OF LOSS FOR AN UNINSURED SUBCONTRACTOR.

Appellate courts review the factual findings made by a workers' compensation court with "substantial deference" in recognition of the compensation court's expertise and opportunity to hear witnesses and assess their credibility. Goulding v. N.J. Friendship House, Inc., 245 N.J. 157, 167 (2021). Therefore, review "is limited to 'whether the findings made could reasonably have been reached on sufficient credible evidence present in the

18

record, considering the proofs as a whole.'" Sager v. O.A. Peterson Constr., Co., 182 N.J. 156, 163-64 (2004) (quoting Close v. Kordulak Bros., 44 N.J. 589, 599 (1965)). The applicable standard of appellate review requires that we defer to a workers' compensation judge's findings when those findings "reasonably could have been reached on the basis of sufficient credible evidence in the record, with due regard to the agency's expertise." Brock v. Pub. Serv. Elec. & Gas Co., 149 N.J. 378, 383 (1997). We likewise defer to a compensation judge's findings that the evidence adduced was not credible, sufficient, or persuasive.

"An agency's interpretation of a statute, however, although entitled to some weight, is not binding on the reviewing court." Goulding, 245 N.J. at 167 (quoting Brock, 149 N.J. at 383). Rather, "courts remain the 'final authorities' on issues of statutory construction and [need not] 'stamp' their approval of the administrative interpretation." Ibid. (alteration in original) (quoting Koch v. Dir., Div. of Tax'n, 157 N.J. 1, 8 (1999)).

In applying provisions of the Workers' Compensation Act, N.J.S.A. 34:15-1 to -147 ("the Act"), it is long-settled that it "is humane social legislation designed to place the cost of work-connected injury upon the employer who may readily provide for it as an operating expense." Ibid. (quoting Tocci v. Tessler & Weiss, Inc., 28 N.J. 582, 586 (1959)). Accordingly, courts must "liberally

constru[e] the Act to implement the legislative policy of affording coverage to as many workers as possible." Ibid. (alteration in original) (quoting Brower v. ICT Grp., 164 N.J. 367, 373 (2000)).

## A.

### 1.

Hartford argues the court held it to an unreasonably high standard and failed to recognize the burden of proof applicable to Hartford's cancellation claim was merely that of a preponderance of the evidence. Hartford contends it cancelled the workers' compensation policy it issued to Triple Star and, therefore, it should not be required to defend the claim made by petitioner for injuries that led to decedent's death.

Hartford asserts the court erred when it faulted Sadler's testimony on the basis that she was not the actual employee who made the audit calls to Triple Star. According to Hartford, the court incorrectly concluded that because Sadler did not make the calls to Triple Star, those calls could only be proven by testimony from the actual callers, rather than the business records of the calls. Hartford argues Sadler's testimony falls under the business record exception to the hearsay rule. N.J.R.E. 803(c)(6). It emphasizes the New Jersey Supreme Court in Mahoney v. Minsky mandated courts "cease to be pedantic and

endeavor to be practical" in their application of the business record exception. 39 N.J. 208, 217 (1963) (quoting 5 <u>Wigmore on Evidence</u>, § 1530, p. 379 (3d ed. 1940)). Hartford asserts there is no requirement that the foundation witness possess any personal knowledge of the act or event recorded. <u>State v. Martorelli</u>, 136 N.J. Super. 449, 453 (App. Div. 1975). Additionally, petitioner did not introduce any evidence to rebut Sadler's testimony.

Hartford further argues the court erred in concluding it presented no evidence that the Bureau gave permission to cancel its policy issued to Triple Star. It notes that after it notified the Bureau of Triple Star's non-compliance, the Bureau responded: "If you do not hear from the employer within the time frame stipulated in the attached letter, you may proceed to issue a notice to initiate cancellation of coverage for non-compliance . . . ."

Hartford claims the court erred in concluding it had not met the notice requirement. It argues the onus was on Triple Star to update its address with its insurers. Hartford cites <u>Cardinale v. Mecca</u>, claiming the insurer may rely on the address given to it by the insured for all notices regarding policy, even if the mail is returned undeliverable. 175 N.J. Super. 8, 12 (App. Div. 1980). Because Triple Star never updated its address, Hartford was justified in relying on the address.

Hartford further asserts the court held it to an unreasonable burden on establishing the cancellation notice was mailed to Triple Star. It asserts "there is nothing in [the] Workers' Compensation Statute which speaks to the requisite proofs required to demonstrate compliance with the statute's provisions." Hartford instead points to similar provisions in the auto insurance statute requiring the insurer to maintain a U.S. Postal Service date-stamped proof of mailing showing the name and address of the insured and to retain a duplicate copy of the mailed notice which is certified to be a true copy by an employee of the insurer. N.J.S.A. 17:29C-10. Hartford claims this standard was adopted by the Legislature in response to an "unjustifiably heightened standard of proof" established by the New Jersey Supreme Court in Weathers v. Hartford Insurance Group, 77 N.J. 228 (1978). This guidance from the auto insurance statute influenced Hartford's mailing practices in this matter.

Hartford adds, relying on Waite v. Doe, 204 N.J. Super. 632 (App. Div. 1985), it is practical to reject such a high standard of proof because "[t]he mass mailing of insurance notices by a national insurance company is not akin to the proofs and recollections which are regularly available to those who mail single, specific items." Given the volume of mailings and employment turnover, Hartford urges us to employ a more reasonable standard, such as that utilized by

22

the Supreme Court in <u>SSI Medical Services, Inc. v. State, Department of Human Services</u>, 146 N.J. 614, 624 (1996). There, the Court stated:

> [W]here the business organization is large, the nature of the business operations is complex, and the items mailed on a daily basis are voluminous, it may not be possible for individuals engaged in mailing activities to recall actual mailing of a document or whether the custom or practice of mailing was followed on a given day. . . . In such cases, other corroborating proof creating the reasonable inference that the custom was followed on the given occasion may suffice to establish proof of mailing.
>
> [<u>Ibid.</u>]

Additionally, Hartford argues the court erred in concluding it did not comply with the certification requirement of N.J.S.A. 34:15-81(b), because the employee who submitted the certification lacked personal knowledge as to the actual mailing of the cancellation notice. It argues the certification requirement means the carrier is only responsible for showing that an individual at the carrier can verify the cancellation notice was sent, but the individual need not have personal knowledge of the mailing. Hartford claims <u>New Century Financial Services, Inc. v. Oughla</u>, 437 N.J. Super. 299, 326 (App. Div. 2014), supports that the affiant may rely upon records kept in the regular course of business as the basis for their knowledge. It contends that although its certifying employee, Johnson, "may not have had personal knowledge as to the mailing of the notice

of cancellation, he had sufficient knowledge to be the employee charged with certifying the company's information . . . pursuant to N.J.R.E. 803(c)(6)."

2.

In Sroczynski v. Milek, the Court noted that because of the public policy favoring workers' compensation insurance, insurers must strictly comply with N.J.S.A. 34:15-81 to avoid allowing a carrier to evade their obligation to provide workers the coverage to which they are entitled. 197 N.J. 36, 41-43 (2008) (affirming substantially for the reasons expressed in the judge of compensation's opinion). The cancellation of workers' compensation insurance is governed by N.J.S.A. 34:15-81, which provides in relevant part:

> Any contract of insurance issued by a stock company or mutual association against liability arising under this chapter may be canceled by either the employer or the insurance carrier within the time limited by such contract for its expiration.
>
> No such policy shall be deemed to be canceled until:
>
> a. At least ten days' notice in writing of the election to terminate such contract is given by registered mail by the party seeking cancellation thereof to the other party thereto; and
>
> b. Until like notice shall be filed in the office of the commissioner of banking and insurance, together with a certified

> statement that the notice provided for by paragraph "a" of this section has been <u>given</u>; and
>
> c. Until ten days have elapsed after the filing required by paragraph "b" of this section has been made.
>
> [(Emphasis added).]

In short, a carrier effectuates a cancellation after providing both notice of cancellation by registered mail to the insured and "like notice" to the Bureau with a certified statement confirming notice was sent to the insured.

Pursuant to its authority under N.J.S.A. 34:15-90.2, the Bureau set forth requirements for cancellation in the Bureau Manual, which allows insurers to conduct audits and terminate a policy for non-compliance by following this procedure:

> (a) Written documentation to the . . . Bureau citing the Endorsement provision(s) in violation, to include certified mailing delivery confirmation to the employer and producer, if any, for compliance.
>
> (b) After review, and upon the . . . Bureau's satisfaction of the carrier's efforts, the . . . Bureau will notify the employer, and producer, if any, in writing, of the carrier's formal request for termination. Such notification will allow the employer an additional [twenty] business days to comply with the policy provisions and authorize the carrier to begin cancellation if the carrier is not contacted within [twenty] business days.

25

(c) Issuance by the carrier of the approved notice of cancellation shall provide the employer with [thirty] days advance notice of termination.

(d) Resultant compliance by the employer prior to, or within [thirty] days after, the effective date of cancellation shall result in reinstatement or issuance of short[-]term insurance as provided for in 3:14-8(14)(a), (b) and (c) of the Plan.

[N.J. Comp. Rating & Inspection Bureau, N.J. Workers Comp. & Emps. Liab. Ins. Manual, Part 3 § 14.8(11) (2021).]

Pursuant to these guidelines, Hartford sent the letter to the Bureau explaining Triple Star was not cooperating with the audit attempts. This letter included copies of the certified mailings to Triple Star and Chadler. On October 25, 2016, Hartford received the Bureau's response permitting them to initiate cancellation if they did not hear from Triple Star within the time frame provided. On November 30, 2016, Hartford sent the notice of cancellation to Triple Star with an effective cancellation date of January 20, 2017. To comply with the "like notice" requirement in N.J.S.A. 34:15-81(b), Hartford emailed spreadsheet data including the cancellation of its policy issued to Triple Star, with a certification statement signed by Johnson.

We begin by addressing Hartford's compliance with N.J.S.A. 34:15-81(b). The New Jersey Supreme Court addressed the certified statement requirement

from N.J.S.A. 34:15-81(b) in Sroczynski. 197 N.J. at 43. There, an insurer sent notice of cancellation by certified mail to the employer but filed its "like notice" with the Bureau via an electronic file transfer protocol as advised in the Bureau Manual. Id. at 39-41. The Court found the insurer did not effectively cancel the policy because it failed to file a certified statement when it electronically transmitted the data. Id. at 44. The Court stated:

> [T]he Legislature did not simply require notice to the Commissioner but also commanded that the insurer provide a certification by an employee attesting to the truthfulness of the fact that proper notice was afforded the insured. Although the legislative history of the Act is sparse, it seems obvious that the purpose of that provision was to place personal responsibility on an employee of the insurer to assure that proper notice of cancellation was given and to require that employee to certify to that fact, recognizing the legal implications of a false certification. The electronic provision of information to the Commissioner, without a certification, completely defeats the notion of personal responsibility that the certification provision was intended to secure.
>
> [Id. at 44.]

Sroczynski differs from the matter before us because that matter involved a failure to provide a certification accompanying the notice to the Bureau. Id. at 41. Here, Hartford did have a practice of sending a signed certification to the Bureau via email and followed that practice when effecting the cancellation of

its policy issued to Triple Star. Hartford also produced an employee, Johnson, who testified to signing the certification. However, the Court in <u>Sroczynski</u> was concerned about the person executing the certification having knowledge that the proper notice of cancellation was provided and, therefore, determined that without a proper certification there would be no one assuming personal responsibility by recognizing the legal implications of a false certification. <u>Id.</u> at 44.

Notably, Johnson testified to not knowing if the notice of cancellation was sent to the employer:

> [FREIGHT'S COUNSEL]: I just wanted to clarify . . . did you have any actual knowledge that the mailing for this particular policy notice of cancellation went out?
>
> [JOHNSON]: I'm not involved in that procedure at all.
>
> [FREIGHT'S COUNSEL]: Then I just want to refer you back to [an exhibit] wherein just above your signature it states that, "the undersigned on behalf of the carrier further certifies that notice to terminate the stated contracts of insurance have been given to employers in accordance with the requirements," but you had no knowledge as to whether or not the mail went out?
>
> [JOHNSON]: That's correct. Not my responsibility. My responsibility is to send the electronic file.

In accordance with Sroczynski, the certification of the "like notice" to the Bureau must "place personal responsibility" on the signatory. Ibid. The signatory must be aware of the "legal implications of a false certification." Ibid. Here, Johnson was not competent to certify to the Bureau that the notice of cancellation was mailed to Triple Star, as he did not have the requisite personal knowledge required by Sroczynski. Given the foregoing, Hartford did not have in place an adequate procedure that would satisfy the requirement in N.J.S.A. 34:15-81(b).

The court did not err in finding Hartford failed to comply with N.J.S.A. 34:15-81(b). It determined the testimony offered was insufficient to carry Hartford's burden to show a cancellation under N.J.S.A. 34:15-81(b), when viewed in light of the public policy that favors the continuation of coverage unless the insurer strictly complied with all statutory and regulatory requirements. We decline to second-guess its evaluation of the testimony and other evidence. Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 588-89 (1988). The court's decision was amply supported by the record, and we discern no basis to disturb its finding regarding the cancellation issue. Because Hartford failed to establish compliance with N.J.S.A. 34:15-81(b), we need not address whether it complied with N.J.S.A. 34:15-81(a).

A-2302-21

B.

1.

Freight argues the court erred in finding it was liable, through NJPLIGA, for dependency benefits to petitioner under the "special employee relationship" theory. The lease agreement between Triple Star and Freight stated the responsibilities of Freight were limited to the arrangement of transportation of goods on behalf of its customer. Other restrictions in the agreement noted Freight did not have any responsibilities in transporting the goods or controlling the means or methods that Triple Star used to transport them.

Freight contends both parties recognized the relationship was an independent contractor relationship. It asserts this is supported by Mastrangelo, who stated Triple Star was free to reject loads for shipping. It contends the evidence does not support a conclusion that an employee-employer relationship existed because the three elements set forth in Volb are not present. 139 N.J. at 116. Relatedly, Freight contends the court erred in finding it liable under the

A-2302-21

"control test" or the "business-furtherance test" for finding a "special employee" relationship. See Galvao v. G.R. Robert Const. Co., 179 N.J. 462, 468 (2004).[5]

Freight argues Triple Star was not doing the work of Freight or furthering its business because Freight's work was "limited to the arrangement of transportation of freight on behalf of its customers." It further contends Triple Star was "solely responsible for the operation of the equipment and transportation of [the] freight," and Freight did not control the means of work, but only the result, which was the delivery of the freight.

NJCIC argues the trial court correctly found a "special employee" relationship between Freight and decedent.[6] This is because the lease constituted an express "contract of hire," Freight took workers' compensation deductions from decedent's pay, decedent engaged in work that was "literally and exclusively" the work of Freight, and Mastrangelo's testimony demonstrated Freight "controlled" aspects of the work such as delivery dates and times.

While decedent was frequently compensated by paychecks issued by Container to Triple Star, Mastrangelo confirmed Freight provided the funds for

_____

[5] Similarly, a "control test" and a "relative nature of the work test" are used for determining if an independent contractor relationship exists. See Lesniewski v. W.B. Furze Corp., 308 N.J. Super. 270, 280 (App. Div. 1998).

[6] Container adopts NJCIC's arguments.

A-2302-21

all owner/operator paychecks issued by Container. Additionally, Freight had the power to discharge decedent because the lease expressly stated the agreement "may be terminated without cause at any time by either [p]arty." These facts, NJCIC argues, satisfy two additional factors in finding a "special employee relationship," in addition to the elements from Volb. See Vitale, 447 N.J. Super. at 117-18 (quoting Hanisko v. Billy Casper Golf Mgmt., Inc., 437 N.J. Super. 349, 361 (App. Div. 2014) ("Two additional factors may also be considered: (1) whether the special employer pays the employee's wages; and (2) whether the special employer 'has the power to hire, discharge or recall the employee.'")).

2.

An employee is defined as someone who performs a service for an employer for financial consideration. N.J.S.A. 34:15-36. The definition of employee is construed broadly to bring as many workers as possible within coverage. Hannigan v. Goldfarb, 53 N.J. Super. 190, 195 (App. Div. 1958). It is well-established that the "workers' compensation law recognizes . . . an employee may have two employers, both of which may be liable for compensation." Vitale, 447 N.J. Super. at 116; see also Blessing v. T. Shriver & Co., 94 N.J. Super. 426, 429-30 (App. Div. 1967) ("There is no question that

in this jurisdiction an employee, for the purposes of workmen's compensation, may have two employers, both of whom may be liable to him in compensation . . . .").

To establish a special employee relationship, three factors must be present. Volb, 139 N.J. at 116. Volb states:

> When a general employer lends an employee to a special employer, the special employer becomes liable for workmen's compensation only if:
>
> (a) The employee has made a contract of hire, express or implied, with the special employer;
>
> (b) The work being done is essentially that of the special employer; and
>
> (c) The special employer has the right to control the details of the work.
>
> [Ibid. (quoting Blessing, 94 N.J. Super. at 430).]

Courts may also consider whether the special employer "pays the employee's wages," Vitale, 447 N.J. Super. at 117-18, and whether the special employer "has the power to hire, discharge[,] or recall the employee." Ibid. (quoting Hanisko, 437 N.J. Super. at 361). Ultimately, "the most important factor in determining a special employee's status is whether the borrowing employer had the right to control the special employee's work." Volb, 139 N.J. at 116.

A-2302-21

Here, the court concluded decedent was a special employee based on the following: (1) the lease agreement was a "written contract of hire" between Freight and decedent; (2) Freight's settlement statements showed deductions of $140 per week from decedent's pay for workers' compensation coverage; (3) decedent was hauling for Freight on the day of the accident, and the work being done "was essentially that of the special employer"; (4) decedent's truck bore the decal and DOT number for Freight; (5) Freight "controlled the details of the work being performed by the decedent" and determined when and where to deliver the freight; (6) Freight paid decedent's wages; and (7) Freight had the power to discharge decedent because the lease expressly stated the agreement "may be terminated without cause at any time by either [p]arty." Thus, the court determined the three prongs set forth in Volb were satisfied, along with the Vitale factors.

There was ample evidence in the record to support the court's decision. While the lease agreement provided that Triple Star was to be considered an independent contractor, the lease does not overcome the substantial evidence that Freight was the special employer of Triple Star.

To the extent we have not specifically addressed any other arguments raised on the appeal and cross-appeal, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2302-21